John SULLIVAN, Claimant–
Appellant/Cross–
Respondent,

v.

MASTERS JACKSON PAVING COM-
PANY, Employer–Respon-
dent/Cross–Appellant,

The Travelers/Aetna Casualty and
Surety Company, Insurer–Re-
spondent/Cross–Appellant,

and

Treasurer of the State of Missouri, as
Custodian of the Second Injury
Fund, Respondent.

Nos. 23539, 23540.

Missouri Court of Appeals,
Southern District,
Division Two.

Jan. 23, 2001.

Michael D. Mayes, Schmidt, Kirby & Sullivan, Springfield, Attorney for Appellant/Cross–Respondent.

William D. Powell, Daniel, Clampett, Powell & Cunningham, L.L.C., Springfield, Attorney for Respondents/Cross–Appellants.

Jeremiah W. (Jay) Nixon, Attorney General and Karen L. Johnson, Assistant Attorney General, Jefferson City, Attorneys for Respondent.

GARRISON, Judge.

These consolidated appeals from an award of the Labor and Industrial Relations Commission ("Commission") raise three main issues: whether the Commission erred (1) in finding that John Sullivan ("Employee") sustained a permanent partial, rather than total, disability; (2) in setting Employee's compensation rate; and (3) in awarding Employee future medical care.

Employee contracted with Masters Jackson Paving Company ("Employer") to use his dump truck hauling asphalt, rock and other materials to job sites throughout Missouri. The basis of Employee's claim is a back injury sustained on September 28, 1991 when a hopper loading asphalt into Employee's truck malfunctioned and spilled asphalt over his truck. Employee got on the truck to clean the asphalt off so he could put a tarp over the load. In doing so, he slipped and fell off the railing of the truck, falling four to five feet to the sloping gravel roadway. He landed on his

feet, but continued to fall sideways hitting his back and elbow and landing on all fours. He testified that he felt pain in his back and legs when he fell, but continued to work for approximately one month, at which time he quit because he was in pain and felt that he was taking too much medication to be safe. He was seen by his family physician, Dr. Tom Morrison in Aurora, Missouri on October 1, 1991, and continued seeing him for several years for his back problems with the typical treatment being prescriptions for Demerol.

Employee saw Dr. Anne Winkler, a rheumatologist, in October 1992. She ordered a CT scan that showed postoperative changes from a previous diskectomy [1] and either a postural osteophyte or tricalcified herniated disc at L5–S1 with some impingement of the left S1 nerve root, and referred him to Dr. Paul Olive, an orthopedist. At that time, Employee said that he was trying to control his pain by taking six to eight Demerol pills and a pint of whiskey per day. Dr. Anne Winkler suggested that he continue the Demerol and alcohol.

It is pertinent to note that Employee had a history of alcohol problems dating back as early as 1970. He was hospitalized for alcohol related treatment in 1971, and from 1984 to 1986 his drinking had gotten to the point that he asked his doctor for a prescription for Antabuse.

Dr. Olive's care of Employee can be summarized as follows: in October 1992, he found mild limitation of motion and tenderness in the low back, and diagnosed degenerative disk disease; in December 1992, Dr. Olive noted that his physical condition was unchanged with back pain and burning down the left leg, and he prescribed Prednisone; in January 1993, Employee reported not sleeping well because of back pain, and was prescribed a muscle relaxer and continued exercise; in March 1993, Dr. Olive noted that Employee had not improved but did not believe he was a surgical candidate; in July 1993, Dr. Olive found his condition to be "about the same," but with increased pain down the left leg, and he arranged a series of epidural injections and continued the prescription of a muscle relaxer; in August 1993, Dr. Olive found that Employee was improved after the epidural steroid injection, still had numbness in the left foot, had a lot of back pain, and prescribed a TENS unit; and on his last visit in November 1993, Dr. Olive found that the back pain was unchanged and he prescribed another TENS unit. Dr. Olive continued prescribing muscle relaxers for Employee throughout his care of him.

Employee's attorney sent him to Dr. David Volarich in December 1996 for a disability evaluation. Dr. Volarich did not believe that Employee could then work, but believed that he needed further treatment, including diagnostic scans to assess the disk, and treatment at a pain clinic for withdrawal from narcotics. In Dr. Volarich's opinion, Employee had an axial compression injury, which caused severe lumbosacral strain/sprain; aggravation of his pre-existing lumbar syndrome, including degenerative disc disease, and degenerative joint disease; and a possible recurrent herniated disk at L5–S1. He also diagnosed a narcotic addiction and severe back pain syndrome including myofacial pain syndrome. Dr. Volarich noted that Employee had preexisting back problems including a herniated disc at L5–S1 with decompression of the L4–5 and L5–S1 levels, a resolved lumbar strain, a resolved cervical strain and alcoholism. He found that the work injury was the "substantial contributing factor to the development of the severe lumbosacral strain/sprain, ag-

1. Employee had fallen in the 1970s and sustained a ruptured disk at the L4–L5 level for which he had surgery in 1978. He also had an automobile accident in 1982, and a myelogram was suggestive of a herniated disk at L5–S1. Employee denied having problems with his back after being treated by a chiropractor following the automobile accident.

gravation of his pre-existing lumbar syndrome and recurrence of the left leg radiculopathy, all of which continue to cause his multiple difficulties that require extensive narcotic medication to attempt to control his symptoms." It was his opinion that Employee had not reached maximum medical improvement, but assuming no additional treatment was rendered, he believed that there was a 50% permanent partial disability of the body as a whole as a result of the work injury, a 15% permanent partial disability which preexisted the work injury because of the prior disc herniation and surgical repair, and that the combination of impairments created a substantially greater disability than the simple total of each "and a loading factor should be added." Dr. Volarich did not attempt to assess any rating for chronic alcoholism, but confirmed that Employee began treatment for alcoholism in the 1970s, and that his alcoholism pre-dated the work injury at issue in this case, but said he recommended treatment at a pain center to withdraw Employee from narcotics.

Employer referred Employee to Dr. Terry Winkler for an evaluation in January 1996. Dr. Winkler diagnosed Employee's condition as low back pain, probable Demerol dependency, and alcoholism. He said that because of Employee's history of alcoholism, he was at a much higher risk for developing a dependency for other medications if provided on a regular basis. Dr. Winkler found inconsistencies on his physical examination, believing that Employee's expressed symptoms outweighed any objective findings. He said, however, that Employee had reached maximum medical improvement, and rated him as having a 10% disability of the body as a whole as a consequence of the work injury; he had a pre-existing disability of 20% of the body as a whole; and that his overall rating was 30% to the body as a whole. He said that a person with a 30% permanent partial disability rating has significant

functional limitations. Dr. Winkler did not believe that Employee was totally disabled.

The claim was heard by an administrative law judge ("ALJ") who issued an award in April 1999 finding that Employee had 20% permanent partial disability from the work injury, and that he was not permanently and totally disabled. He also found that Employee had a 17.5% disability from the pre-existing condition, and that a combination of the pre-existing disability and the disability from the work injury created a greater disability than their simple sum to the extent of fifteen weeks of compensation which the Second Injury Fund was ordered to pay. The ALJ found that the compensation rate for the permanent partial disability was $213.57 per week based on the gross income received by Employee, and that Employee was entitled to future medical treatment, specifically referring to treatment for withdrawal from alcohol and Demerol, and for pain control.

Both parties appealed to the Commission, which modified the award by finding that the applicable average weekly wage was the minimum of $40. It adopted the rest of the findings of the ALJ. Employee and Employer appeal.

 In reviewing a workers' compensation award, we review the findings of the Commission and not those of the ALJ. *Williams v. City of Ava,* 982 S.W.2d 307, 310 (Mo.App. S.D.1998). Where, as here, the Commission's award incorporates the ALJ's award and decision, we consider the findings and conclusions of the Commission as including the ALJ's award. *Id.* We first examine the whole record, viewing the evidence and all reasonable inferences therefrom in the light most favorable to the award, in order to determine if the record contains sufficient competent and substantial evidence to support the award. *Davis v. Research Med. Ctr.,* 903

S.W.2d 557, 571 (Mo.App. W.D.1995). If there is sufficient competent and substantial evidence to support the award, we then determine if the award is against the overwhelming weight of the evidence. *Id.* In our review, we are mindful that we may not substitute our judgment on the weight of the evidence or on the credibility of witnesses for that of the Commission. *Id.* The Commission is free to disbelieve uncontradicted and unimpeached testimony. *Alexander v. D.L. Sitton Motor Lines,* 851 S.W.2d 525, 527 (Mo. banc 1993). Its interpretation and application of the law, however, are not binding on this Court and fall within our realm of independent review and correction. *Davis,* 903 S.W.2d at 571.

## CASE NO. 23539

■ In his first point on this appeal, Employee contends that the Commission erred in not finding that he was permanently and totally disabled. He argues that the record does not contain substantial evidence of a permanent partial disability, but rather the overwhelming weight of the evidence demonstrated that he had a permanent, total disability.

■ "Total disability" is defined as the inability to return to any employment and not merely the inability to return to the employment in which the employee was engaged at the time of the accident. § 287.020.7.[2] The test for permanent total disability is whether, given the claimant's situation and condition, he or she is competent to compete in the open labor market. *Reiner v. Treasurer of State of Mo.,* 837 S.W.2d 363, 367 (Mo.App. E.D.1992). The question is whether an employer in the usual course of business would reasonably be expected to hire the claimant in the claimant's present physical condition, reasonably expecting the claimant to perform the work for which he or she is hired. *Id.*

Here, Employee argues that the only evidence in the record in support of the finding that he was not permanently, totally disabled were "vague references" by Drs. Terry Winkler and Olive. This is with reference to Dr. Winkler's testimony that Employee "had 30% impairment total [sic] to the body as a whole. [He] didn't see any signs that he was totally disabled." He also references Dr. Olive's statement that Employee could probably perform a more sedentary type of job. Employee concludes that this evidence lacked sufficient foundation to be "substantial evidence."

Employee also contends that the overwhelming weight of the evidence supported a finding of permanent, total disability. He points to the testimony of Dr. Volarich which he portrays as being that he "was unable to do any work." Employee also refers to the testimony of others including Dr. Morrison, who described specific functional limitations; and the testimony of Dr. Olive where he said that Employee would need to lie down during the day because of his back symptoms.

In making its findings, the Commission concluded that the testimony of Dr. Terry Winkler and Dr. Olive were the closest to accurately describing claimant's condition. The Commission found, however that the extent of Employee's permanent partial disability was greater than Dr. Winkler opined because of the extreme and chronic pain Employee was continuing to experience. It concluded that, based upon the physical findings and restrictions (primarily of Dr. Terry Winkler but also considering those of the other physicians in this case), in addition to Employee's testimony of his pain and limitations in activities, Employee sustained permanent partial disability to the body as a whole of 20% from his injury at work.

■ The acceptance or rejection of medical evidence is for the Commission. *Bowman v. Zenith Radio Corp.,* 895

---

2. All statutory references are to RSMo 1986, unless otherwise indicated.

S.W.2d 276, 280 (Mo.App. S.D.1995). "It was not required, therefore, to believe and make a finding based on the evidence which Claimant argues would support an award for permanent total disability." *Id.* Instead, the Commission was entitled to believe evidence which could support a different finding. Additionally, the Commission was not bound by the experts' exact percentages of disability and was free to find a disability rating higher or lower than that expressed in medical testimony. *Sifferman v. Sears, Roebuck and Co.*, 906 S.W.2d 823, 826 (Mo.App. S.D.1995). There was ample evidence to support a finding of permanent partial disability. This point is denied.

■ In his second point, Employee asserts that Commission erred in setting his compensation rate at the minimum of $40 per week. He contends that the evidence, including his tax returns, was sufficient to support an average weekly wage at the state maximum because the evidence provided "a basis for actual and/or special expenses incurred in employment to properly calculate the average weekly wage."

According to Employee's tax returns, he had gross wages of $28,467 in 1990, and expenses of $21,518, for a net profit of $6,949. In 1991, his income tax return showed income of $40,047 from which was deducted $28,535 for "[c]ost of goods sold" in arriving at a gross income of $11,512. From that was deducted expenses of $10,836, leaving a net profit of $676.

Employer argued that pursuant to what is now § 287.250(7),[3] the expenses should be deducted from the gross wages to calculate the average weekly wage. The ALJ

referenced *Swallow v. Enterprise Truck Lines, Inc.*, 894 S.W.2d 232, 234 (Mo.App. E.D.1995), which held that where "the employer engages an individual to furnish and drive a truck, the trucker's expenses 'are regarded as special expenses'" and that "those expenses are not included in the employee's earnings." In this case, however, the ALJ noted that there was no proof of the actual or special expenses incurred by Employee in providing and operating the truck for Employer. The ALJ referred to the income tax return for 1991 in which "[c]ost of goods sold" of $28,535 was only explained by being entered on a line designated "[m]aterials and supplies." The ALJ said that "[n]o evidence was elicited as to what 'goods' would be sold for [Employee] to operate a truck hauling asphalt and road materials," and that Employee's gross wages "are the average weekly wage." He concluded that those wages were sufficient for the maximum rate applicable in September 1991 of $213.57 per week for permanent partial disability. The Commission modified the award by applying the minimum average weekly wage rate of $40.

In entering its final award modifying the award and decision of the ALJ, the Commission cited *Reed v. Kansas City Wholesale Grocery Co.*, 236 Mo.App. 402, 156 S.W.2d 747 (1941). There the claimant was a traveling salesman who had an agreement with the employer to sell its goods in return for a commission of 50% of the net profit. Under the agreement, claimant furnished an automobile and was responsible for paying his own traveling expenses. The court referred to an earlier statute which, like § 287.250(7), provided that in computing annual earnings "there shall not be included the wages of helpers

---

**3.** Prior to 1992, § 287.250(7) provided that in computing earnings, "any sums which the employer paid to the employee to cover any special expenses entailed on him by the nature of the employment" shall not be included. In 1992, § 287.250, RSMo, was amended and (2) of that section now reads: "Any wages paid to helpers or any money paid by

the employer to the employee to cover any special expenses incurred by the employee because of the nature of his employment shall not be included in wages." statute in effect at the time of the injury is the appropriate one to use in calculating the average weekly wage. *See Bowman,* 895 S.W.2d at 278.

or any sums which the employer paid to the employee to cover any special expenses entailed on him by the nature of the employment." *Id.* at 749. Based on that statute, the court said that "[a]ccording to the design of the law as above described, it may be said that compensation allowed under the Missouri act is to make good to the employee two-thirds of the earnings of which he has been deprived by the injury, and the basis of the award is the resulting loss." *Id.* at 750. There, the court considered it immaterial whether the employer gave one check for the compensation, or two checks, one for special expenses and the other for the balance of the commission because the result was that the employer paid the money required to cover the special expenses entailed on the employee by the nature of the employment. *Id.* at 752. The court summarized numerous authorities and said that they "support the proposition that where an employer engages an individual to render personal service and in conjunction therewith to furnish trucks, horses, wagons or other things with which to do the work, the expenses of such other things are regarded as special expenses entailed upon the employee by the nature of the employment and are not included in the earnings of the employee." *Id.* Finally, the court said:

> We hold in this case that all special expenses entailed on claimant by the nature of his employment during the year preceding the accident should be deducted from the gross amount of commissions received by him during said period as the basis upon which to determine his annual earnings for the purpose of computing the compensation to which he is entitled. The commission did not do this, but based compensation upon the gross income of claimant and thereby stretched the blanket of compensation to cover losses that were never sustained by claimant. This was contrary to the spirit and letter of the Workmen's Compensation Law.

*Id.* at 753.

The Commission also cited *Gass v. White Superior Bus Co.*, 395 S.W.2d 501 (Mo.App.1965). There, the claimant and his father were each employed to deliver school buses for which they were paid flat fees. Except for the expense of any mechanical repairs necessary during the trip, all other expenses were the responsibility of each of them. Claimant testified that while he had incurred some expense, he could not say how much. The ALJ set the compensation rate based on an assumption that the claimant's expenses had been the same as his father's, which were demonstrated in the evidence. The Commission modified that rate by setting it at the minimum average week wage rate, holding that claimant had failed to prove his compensation rate. *Id.* at 505. The appellate court noted that money paid by an employer to the employee to cover special expenses is to be excluded from the earnings calculation. *Id.* at 506. It concluded that an award cannot be based on mere speculation, suspicion or conjecture, and affirmed the award of the Commission setting the compensation rate as the minimum provided by law. *Id.*

In modifying the award entered by the ALJ in this case, the Commission noted that a claimant bears the burden of proving all material elements of his claim, including sufficient proof for the Commission to determine the proper compensation rate, citing *Sanders v. St. Clair Corp.*, 943 S.W.2d 12, 18 (Mo.App. S.D.1997). The Commission concluded that under the evidence, it could only speculate as to Employee's expenses because he had not proven them. Consequently, it followed *Gass* in applying the minimum wage rate.

Here, the testimony demonstrated that Employee's arrangement with Employer called for him to furnish his dump truck and pay the expenses of its operation. Employee had also worked for Employer during 1990, apparently under the same arrangement. In 1990, all of Employee's earned income ($28,467) was from Employer. Employee testified that the expenses

for his trucking operation that year were accurately reflected in his income tax return. According to that income tax return, he had expenses of $21,518, leaving a net profit of $6,949.

The one-year contract that Employee was operating under as of the date of his accident on September 28, 1991 was dated February 27, 1991. His income tax return for that year showed gross receipts from his trucking business of $40,047, only $27,964.46 of which came from Employer. This indicates that income must have been realized from some other source during that year in the operation of his trucking business, but the identity of that source/s is not revealed in the record. Employee's tax return for 1991 shows a net profit of only $676. In arriving at that net profit, Employee deducted "[c]ost of goods sold"[4] of $28,535 to arrive at a gross profit of $11,512. From the gross profit, he deducted $2,570 for insurance, $3,400 for repairs and maintenance, $3,366 for supplies, $1,100 for taxes and licenses, and $400 for utilities. Assuming, without deciding that all of these expenses would otherwise be appropriately deducted from the gross income in calculating the compensation rate, there is nothing in the record to indicate the extent to which any of these expenses related to Employee's work for Employer as opposed to work for others from whom income was realized. It is the sense of the provision in § 287.250(7) that "there shall not be included ... sums which the employer paid to the employee to cover any special expenses entailed on him by the nature of the employment" applies to money used to cover expenses incurred during that particular employment. This is supported by statements contained in the cases construing that statutory provision, or its predecessors, such as *Reed,* 156 S.W.2d at 752 ("... claimant's earnings

amounted only to the economic gain derived from his employment the annual sum which was available for his support," and "in computing the compensation to which claimant is entitled, the estimate should be based upon his net earnings instead of upon his gross commissions.").

We are unable from this record to determine how much of the expense incurred by Employee during 1991 in the operation of his trucking business was incurred in connection with his work for Employer, as opposed to other work which provided the balance of his income for that year. The expenses incurred by Employee in his work for Employer are the ones that would affect the sums available for his support from that employment. Accordingly, any attempt we might make to determine those expenses applicable to this employment would require speculation, suspicion or conjecture. We agree, therefore, with the Commission that it could "only speculate as to [E]mployee's expenses," and that Employee had failed to sustain his burden of proving sufficient evidence for the Commission to determine the proper compensation rate. The Commission did not err in utilizing the minimum average weekly wage rate of $40. This point is denied.

## CASE NO. 23540

■ In this appeal, Employer first contends that the Commission erred in awarding Employee future medical aid because "there was no expert evidence by reasonable medical certainty the accident caused any need for future medical care."

■ Initially, we note that Employee filed no brief in response to Employer's appeal, a failure which has been repeatedly condemned by the courts. The failure of a respondent to file a brief is an imposition

4. The "[c]ost of goods sold" was only explained as being for "[m]aterials and supplies."

on this court and leaves us dependent upon Employer's presentation and our own research. *Massey v. Todd,* 962 S.W.2d 949, 950, n. 2 (Mo.App. S.D.1998). Because no penalty is imposed by statute or rule, however, we will proceed to determine the case on its merits. *Id.*

Here, Commission found that Employee was entitled to future medical treatment, specifically, referring to his addiction to Demerol and alcohol, as well as his need for treatment for pain control. In doing so, the Commission found that Employee was prescribed Demerol to control pain following the work injury; that Dr. Anne Winkler had recommended that he continue his Demerol and alcohol intact to treat his pain in October 1992; and that even though his alcohol addiction started prior to the accident at work, Dr. Terry Winkler testified that there was an interplay between the alcohol and Demerol dependency/addiction "which I find effectively ties them together in the need for treatment."

 The right to medical aid is a component of the compensation due an injured worker under § 287.140.1. *Mathia v. Contract Freighters, Inc.,* 929 S.W.2d 271, 277 (Mo.App. S.D.1996). That statute entitles the worker to medical treatment as may be reasonably required to cure and relieve from the effects of the injury. *Id.* This means treatment that gives comfort or relieves even though restoration to soundness [a cure] is beyond avail. *Id.* Future medical care must, however, flow from the accident before the employer may be held responsible for it. *Modlin v. Sun Mark, Inc.,* 699 S.W.2d 5, 7 (Mo.App. E.D.1985). In this regard, Employer contends that Employee was required to show causation for future medical treatment to a reasonable degree of medical certainty, citing *Carter v. Jones Truck Lines, Inc.,* 943 S.W.2d 821, 826 (Mo.App. S.D.1997).

 Dr. Volarich testified that as a result of his work injury, Employee was addicted to narcotics and that if he was not a surgical candidate he would need aggressive treatment for pain control.[5] His opinion was to a reasonable degree of medical certainty. There was, therefore, evidence in the record from which the Commission could conclude that the Demerol dependency was the result of his work injury.

Dr. Terry Winkler testified that Employee had a history of alcoholism, and that a person with that condition is at a much higher risk for developing a dependency on other medications if they are provided on a regular basis. While there was testimony that Dr. Anne Winkler told Employee to continue his use of Demerol and alcohol to treat his pain, we are not, however, directed to testimony, based on a reasonable degree of medical certainty, that his alcohol addiction was even exacerbated by his work injury. It obviously did not cause his alcoholism because the record is clear that it had been in existence since the early 1970s. To the extent that Employer was ordered to specifically provide future medical treatment for Employee's alcoholism, we hold that it was not supported by substantial evidence that that addiction was related to the work injury. For this reason, we hold that there was no basis upon which to order Employer to provide future medical treatment specifically for Employee's alcoholism.

There was evidence to a reasonable degree of medical certainty, however, that Employee's need for treatment for pain control, and for his Demerol addiction were caused by his work injury. Ordering future medical treatment under these circumstances was supported by the evidence. Employee is entitled to future medical benefits, even if treatment for withdrawal from Demerol might also over-

5. There was testimony from Dr. Olive that Employee was not a candidate for surgery.

lap treatment that which would have otherwise been provided for his alcoholism. Employer's point has merit to the extent it was ordered to provide future medical care specifically for Employee's alcohol addiction.

■ Employer's final point on appeal is that the Commission erred in awarding future medical treatment as is necessary to cure and relieve Employee from the effects of the injury because it was not supported by competent and substantial evidence, and was against the overwhelming weight of the evidence, "in that except for treatment for [Employee's] dependency on Demerol, it was not shown by reasonable probability [Employee] was in need of any other future medical care." As we understand this point, Employer contends that future medical care should be limited, at the most, to treatment for Employee's Demerol dependency because there was an insufficient showing that he was in need of anything beyond that.

Conclusive evidence is not necessary to support a claim for future medical benefits, but rather, it is sufficient to show that the need for additional medical treatment is a reasonable probability. *Sifferman*, 906 S.W.2d at 828. "Probable" means founded on reason and experience which inclines the mind to believe but leaves room for doubt. *Id.* It is not required that the claimant present evidence of specific medical treatment or procedures which will be necessary in the future. *Polavarapu v. General Motors Corp.*, 897 S.W.2d 63, 66 (Mo.App. E.D.1995). The workers' compensation law is to be liberally construed with a view to the public welfare. § 287.800; *Williams*, 982 S.W.2d at 312. In *Mathia*, 929 S.W.2d at 277–78, we said:

The right to obtain future medical treatment should not be denied merely be-

cause it has not yet been prescribed or recommended as of the date of a workers' compensation hearing, regardless of whether there is evidence that its future need will be reasonably probable. Likewise, such future care to "relieve" should not be denied simply because a claimant may have achieved maximum medical improvement, a finding not inconsistent with the need for future medical treatment.

As indicated above, the Commission found that Employee was in need of future medical treatment for his Demerol and alcohol addictions. It also noted Dr. Volarich's opinion that if Employee was not a candidate for surgery, he recommended, "in addition to the treatment to withdraw [Employee] from narcotics a chronic pain control program." Actually, the record indicates that Dr. Volarich said that if surgery was not indicated, "I would recommend aggressive treatment at a pain clinic to withdraw [Employee] from narcotics. Treatments using chronic pain control with an anti-depressant type medication, biofeedback, TENS Units and other similar treatments was suggested. Repeat courses of epidural steroid injections would also be indicated." The Commission then noted that a CT scan had been performed which was interpreted by Drs. Terry Winkler and Paul Olive, and it found "more reasonable and credible the opinions of Drs. Terry Winkler and Olive that claimant is not in need of any additional treatment at this time other than what is set out above."[6] As adopted by the Commission, the ALJ's award said that "since I have ordered the specific treatment for drug and alcohol dependency as set out above, and future medical care is left open in this case. I order that employer/insurer provide claimant with such future medical care as is necessary to cure and relieve

6. This presumably refers to treatment for withdrawal from alcohol and Demerol, and a chronic pain control program.

claimant from the effects of the injury. Naturally, this may in [the] future include any testing that would be deemed appropriate for treatment regarding the last injury at work."

The portion of the award by which the Commission found that Employee was not in need of any additional treatment "at this time other than what is set out above" was not an unqualified finding that Employee was not, nor would he be, in need of any additional treatment to "cure and relieve." It specifically recognized, by reference, the treatment for his addictions. It also noted Dr. Volarich's recommendation of a chronic pain control program.

The need for such a program, and the potential need for treatment in the future, is highlighted by the fact that Employee was still taking Demerol for pain on a daily basis at the time of the hearing almost seven years after the injury. He testified that, although the intensity varies, he is never free of pain in his lower back and left leg. It is presumed that the Demerol was of some benefit in relieving the pain and, if he is given treatment to assist in the withdrawal from Demerol, he will need treatment for the control of pain.

Dr. Olive's records indicated that he was treating Employee with anti-inflammatory medication, physical therapy, and a lumbar brace, and in March 1993 recommended a continuation of that treatment. On his last visit to Dr. Olive in November 1993, it was noted that Employee had had two epidural injections, but the back pain was unchanged and he was given a prescription for a TENS unit. Dr. Volarich recommended a continuation of the epidural steroid injections and other treatment.

■ Employee was seen in January 1996 by Dr. Terry Winkler, who diagnosed Employee with low back pain, probable dependency on Demerol, and a history of alcoholism. He gave his opinion that Employee sustained a 10% disability to the body as a whole in the work injury, and that he had reached maximum medical improvement. Maximum medical improvement, however, is not inconsistent with the need for future medical treatment. *Williams,* 982 S.W.2d at 311–12; *Mathia,* 929 S.W.2d at 277–78.

In *Dean v. St. Luke's Hosp.,* 936 S.W.2d 601 (Mo.App. W.D.1997), the court held an award for future medical treatment was supported by the evidence. There, the evidence, which the court found sufficient, was the employee's testimony that she continued to take prescription medications six years after her injury, but still experienced pain, and a doctor's testimony that it was very likely that she could need treatment in the future, but that he could not say if the need for treatment would be more probable than not. *Id.* at 605

■ We are mindful that in determining whether an employee has met the standard of proof necessary to support an award for future medical treatment, we should resolve all doubt in favor of the employee. *Id.* at 604. With this in mind, and considering the record here, we cannot say that the award of future medical treatment, exclusive of specific treatment for withdrawal from alcohol, was not supported by competent and substantial evidence of its probable need. This point is, therefore, denied.

The order of the Commission is affirmed except for that portion awarding future medical treatment specifically for the withdrawal from alcohol, which is reversed.

PREWITT, J., and MITCHELL, S.J., concur