Geneva HOUSTON, Appellant,

v.

ROADWAY EXPRESS,
INC., Employer,

Treasurer of Missouri as Custodian
of the Second Injury Fund,
Respondent.

No. 25849.

Missouri Court of Appeals,
Southern District,
Division Two.

March 31, 2004.

Motion for Rehearing and Transfer
Denied April 22, 2004.

Application for Transfer Denied
May 25, 2004.

John E. Price, Carnahan, Evans, Cantwell & Brown, P.C., Springfield, for appellant.

Jeremiah W. (Jay) Nixon, Atty. Gen., Susan F. Colburn, Office of the Attorney General, Jefferson City, for respondent.

### BEFORE THE LABOR AND INDUSTRIAL RELATIONS COMMISSION

KENNETH W. SHRUM, Judge.

In this workers' compensation case, Geneva Houston ("Employee") appeals from the final award of the Labor and Industrial Relations Commission ("Commission") de-

nying her claim against the Second Injury Fund ("Fund") for permanent total disability benefits. This court reverses and remands to Commission.

## STANDARD OF REVIEW

 When reviewing a worker's compensation award, appellate courts "must examine the whole record to determine if it contains sufficient competent and substantial evidence to support the award, i.e., whether the award is contrary to the overwhelming weight of the evidence." *Hampton v. Big Boy Steel Erection*, 121 S.W.3d 220, 222–23[1] (Mo.banc 2003).

## FACTS

Employee, born February 16, 1950, worked most of her adult life as a truck driver. She was driving a truck for Roadway Express ("Roadway") when she sustained an accidental injury to her right hip and knee on December 11, 1993. She was also working for Roadway on September 2, 1994, when she was diagnosed with an occupational disease, specifically bilateral carpal tunnel syndrome. No dispute exists about the fact that Employee's hip and knee injury and the carpal tunnel disease arose out of and occurred in the course and scope of her employment with Roadway.

Before her September 2, 1994, diagnosis of carpal tunnel disease, Employee had other medical problems and conditions, some job related and others nonjob related. Among those conditions were injuries to her left knee that required arthroscopic surgeries in 1982 and 1985, degenerative disc disease, degenerative changes in her upper and lower extremities, and fibromyalgia. The fibromyalgia diagnosis was made in May 1994 after Employee was hospitalized for Legionnaire's disease.

When Employee filed for benefits stemming from these incidents, she made a claim against the Treasurer of Missouri as Custodian of the Second Injury Fund ("Fund"). In an amended occupational disease claim filed on her behalf, Employee alleged, *inter alia*, that "as a result of all [Employee's] work-related injuries and other disabling conditions, [Employee] is totally disabled."

Employee's claim for benefits based on her occupational disease and her claim against the Fund were tried December 4, 2002. The only evidence presented at the hearing was Employee's testimony, her Husband's testimony, Dr. Janie R. Vale's testimony and reports, and Employee's lengthy medical records. The parties stipulated that Dr. Vale was "qualified to give expert testimony in regard to her speciality in occupational medicine."

The evidence established that, in December 1993, Employee was on a truck bumper when a gust of wind caught the truck hood and blew it upward. She was partially knocked off the bumper, and as a result, she twisted her right knee and "felt a pop in her right hip." She was off work due to this accident and injury until early 1994.

In the summer of 1994, Employee was again off work, this time for a nonwork-related condition, namely Legionnaire's disease, a pulmonary embolism, thrombophlebitis, and chronic obstructive pulmonary disease. She was hospitalized for approximately one month for these conditions, and missed work for these reasons until mid-August 1994.

When Employee returned to work, a previously noted hand pain worsened. Ultimately, a treating physician (Dr. Winkler) diagnosed her with bilateral carpal tunnel syndrome. She was treated surgically by Dr. Carla Garrison for the right hand problem on October 17, 1994, and the left hand condition on November 21, 1994.

After a recuperation period, Dr. Garrison released Employee to return to work "without limitations," effective February 6, 1995. Employee returned to Dr. Garrison on February 16, 1995, complaining of numbness and swelling in her hands "since going back to work." At that point, Dr. Garrison told Employee she might not be able to return to her usual job as a truck driver, but found she was "essentially symptom free prior to returning to work." Garrison did recommend she see Dr. Paff for upper extremity therapy.

When Employee saw Dr. Paff, he reported she was unable to work as of February 28, 1995, and put her through a therapy regimen. Following this, Dr. Paff released her to return to work on May 30, 1995, "with no limitations." Employee worked until July 1, 1995, whereon she quit and never returned. Employee testified she quit working because her hip, knee, and hands were so painful she could no longer continue.

Employee's lawyer referred her to Dr. Vale on August 20, 2001. After examining Employee and reviewing her medical records, Dr. Vale concluded that when Employee quit work in July 1995, she had reached "maximum medical improvement" both as to her hip condition and arms. She opined that Employee had sustained a 10% permanent partial disability of the body as a result of her December 11, 1993, work-related accident.[1] She testified that Employee's occupational disease (diagnosed September 2, 1994) left her with a 12% permanent partial impairment of her right upper extremity at the 175–week level, and a 10% permanent partial impairment of the left upper extremity at the 175–week level.

Dr. Vale also rated Employee's "vocationally-limiting impairments" as she found them to exist before the work-related incident of December 11, 1993. First, she found a "15% permanent partial disability to the left lower extremity at the 160 week/knee level."[2] Second, Dr. Vale found that "[d]egenerative disc disease of the lumbar sacral spine" resulted in a "7% permanent partial impairment of the total body." Third, she concluded that "[f]ibromyalgia and diffuse degenerative disc and arthritic changes of the spine and lower extremities diagnosed prior to carpal tunnel syndromes being diagnosed in September of 1994 [had caused] 10% permanent partial impairment of the total body."

Having thus evaluated and rated Employee's various work-related and non-work-related disabilities, Dr. Vale's report concluded: "It is ... my further medical opinion that [Employee's] disability is greater than the simple additive sum of the various impairments noted above. The combined affect[sic] of [Employee's] spine and bilateral upper and lower extremity medical conditions have unfortunately resulted in her being permanently and totally disabled."

## COMMISSION'S AWARD

In its award, the Commission found that "the occupational disease of September 2, 1994, caused [Employee] to sustain an injury to her left and right wrists." After

---

1. Dr. Vale's 10% body-as-a-whole rating for the December 11, 1993, right knee and hip injury included "aggravation to her pre-existing degenerative disc disease in the lumbar/sacral spine." She explained that "[h]er hip pain was not localized only to the hip joint but also involved the gluteal distribution."

2. In making this assessment, Dr. Vale noted Employee was "post two arthroscopic surgeries with intraoperative findings of chondromalacia of the medial femoral condyle, osteochondral fracture of the medial femoral condyle, and patella chondromalacia."

noting that Dr. Vale had rated Employee's occupational disease-related disability at 10% permanent partial disability to the left wrist at the 175–week level, and 12% permanent partial disability to the right wrist at the same level, the Commission found that "these injuries combined to cause a greater disability due [to] involving both upper extremities." Consequently, the Commission ruled Employee's occupational disease had caused a permanent partial disability of 15% to her body as a whole, and ordered Roadway to pay benefits accordingly.

As to Employee's claim against the Fund, the Award read:

> "Based upon Dr. Vale's testimony and the testimony of the employee and her husband, I find the employee had sustained prior permanent disability of 15% of the left knee at the 160 week level and a total of 17% of the body as a whole resulting from the degenerative disc disease, fibromyalgia, and arthritic changes of the spine and lower extremities. I further find that *the ... Fund is liable for enhanced permanent partial disability of 7.5% of the body as a whole as a result of a combination of the employee's occupational disease incurred on or about September 2, 1994, and the employee's pre-existing work and non-work-related conditions.*" (Emphasis supplied.)

Employee appeals from that part of the award entered against the Fund.[3]

## DISCUSSION AND DECISION

■ Employee's two points on appeal raise essentially the same Commission error, namely that it erred in not finding she was permanently and totally disabled.

In Point I, Employee asserts that Commission's award against the Fund was based exclusively on "Dr. Vale's testimony and the testimony of the employee and her husband." Based on that premise, Employee cites Dr. Vale's testimony that Employee "was permanently and totally disabled due to the combination of [her medical conditions]" as mandating reversal. She insists that Commission's award of *permanent partial* disability was "inconsistent with Dr. Vale's opinion and inconsistent with the Commission's own findings."

Employee's second point maintains that, aside from what Commission said about relying on the testimony of Dr. Vale, Employee and Employee's husband, reversal is still mandated when *all* the evidence is reviewed. Specifically, Employee argues that there was no evidence that the combined effects of the 1993 accident, the 1994 illness, and Employee's preexisting conditions rendered her only *partially* permanently disabled as found by the Commission. Because of the similarity of the two arguments, we consider them together.

Before the Fund can be held liable for payment of benefits for permanent disability, the law requires that a permanent partial disability preexist the injury or occupational disease for which the employee claims benefits, and more than that, the preexisting partial disability must be of such seriousness as to constitute a hindrance or obstacle to employment or reemployment. § 287.220.1.[4] *See Loven v. Greene County*, 63 S.W.3d 278, 288 (Mo. App.2001).

---

3. Following the entry of the Award, Employee and Roadway settled their part of this case on exactly the terms as ordered by Commission, except Roadway paid $1,500 more than the awarded amount for the temporary total disability benefit.

4. All statutory references are to RSMo (2000), unless otherwise stated.

On appeal, no one contests the Commission's finding that Employee's proof satisfied all conditions precedent to an award of benefits from the Fund, i.e., that the Fund owed Employee benefits. Specifically, the Fund has not appealed and has thus left unchallenged the Commission's express findings that (1) Employee's occupational disease caused a permanent partial disability of 15% to her body as a whole, and (2) Employee had a "prior permanent disability of 15% of the left knee at the 160 week level and a total of 17% of the body as a whole resulting from the degenerative disc disease, fibromyalgia, and arthritic changes of the spine and lower extremities." Moreover, the Fund has left uncontested the Commission's implicit finding that the preexisting disability was of such seriousness as to constitute a hindrance or obstacle to employment or reemployment. By not challenging these express and implicit findings, the Fund has waived any claim of its nonliability. Consequently, the only issue left is whether Commission erred when it based its award against the Fund on a 7.5% enhanced permanent-partial disability finding, rather than a permanent total disability finding (which Employee contends was mandated by the evidence).

The "total disability" definition is the same for claims against the Fund as for claims against employers. *Smith v. ConAgra, Inc.*, 949 S.W.2d 917, 920 (Mo. App.1997). Specifically, "total disability" is statutorily defined as the inability to return to any employment and not merely the inability to return to the employment in which the employee was engaged at the time of the accident. § 287.020.7. The test for permanent total disability is whether, given the employee's situation and condition, he or she is qualified to compete in the open job market. *Sullivan v. Masters Jackson Paving Co.*, 35 S.W.3d 879, 884

(Mo.App.2001). "The question is whether an employer in the usual course of business would reasonably be expected to hire the claimant in the claimant's present physical condition, reasonably expecting the claimant to perform the work for which he or she is hired." *Id.* at 884[8].

As noted earlier, Employee argues for reversal by pointing out that Dr. Vale's testimony was the *only* evidence presented as to the *extent* by which Employee's overall disability was increased by the combination of her disabilities. In that regard, Dr. Vale opined that the combination of Employee's occupational disease of September 2, 1994, and her preexisting work and nonwork-related conditions rendered her *totally disabled.* According to Employee, since Dr. Vale's opinion on this issue stood alone and no other person evaluated Employee after her carpal tunnel syndrome surgeries and determined the *extent* by which Employee's overall disability was increased by the combination of her disabilities, Dr. Vale's testimony is dispositive, and reversal is mandated.

The Fund answers by arguing that "Employee has failed to prove that she had a prior hindrance or obstacle to employment before the 1994 injury, and that she is permanently and totally disabled as a result of a combination of her injuries." Although Fund's argument for affirmance has multiple components, none address the issue on appeal, i.e., what evidence exists concerning the extent by which Employee's overall disability was increased by the combination of her disabilities. Instead, the Fund's only response to Employee's claim of Commission error is to cite principles of law and evidence that arguably support its belated assertion that the Second Injury Fund was never implicated.

To illustrate, the Fund contends Employee never proved that her alleged pre–1993 disability (left knee injury) was an

"obstacle" to her employment. To support that claim, the Fund asserts Employee never complained to Dr. Vale about pain or difficulty with her left knee and did not "complain during the hearing of vocational impact or any other problem associated with her left knee." This wholly ignores the fact that the Commission accepted Dr. Vale's testimony on this issue and found Employee had a 15% permanent partial disability of her left knee that predated the September 2, 1994, occupational disease. More than that, the Commission used that finding, *inter alia*, as grounds for holding that Fund liability had been proven.[5]

Other arguments advanced by the Fund are equally flawed as they simply advance reasons why the Fund was not implicated. All such reasons patently ignore the Commission's ruling that the Fund was liable. As noted earlier, all claims of insufficient proof of the elements of fund liability were waived when Fund chose not to appeal. Consequently, the only question open is whether the Commission erred in deciding the extent to which Employee's overall disability was increased by the combination of disabilities. We hold that it did err.

■ Generally, acceptance or rejection of medical evidence is for the Commission, *Sullivan*, 35 S.W.3d at 884[9], and it is free to disbelieve uncontradicted and unimpeached testimony. *Alexander v. D.L. Sitton Motor Lines*, 851 S.W.2d, 525, 527[1] (Mo.banc 1993). Even so, when a workers'

compensation record shows no conflict in the evidence or impeachment of witnesses, "the reviewing court may find the award was not based upon disbelief of the testimony of the witnesses." *Corp v. Joplin Cement Co.*, 337 S.W.2d 252, 258[6] (Mo. banc 1960). As the *Corp* court explained it,

> " 'the Commission may not arbitrarily disregard and ignore competent, substantial and undisputed evidence of witnesses *who are not shown by the record to have been impeached,* and the Commission may not base their finding upon conjecture or their own mere personal opinion unsupported by sufficient competent evidence.' "

*Id.* at 258 (quoting *Sanderson v. Producers Comm'n Ass'n*, 360 Mo. 571, 229 S.W.2d 563, 567 (1950)) (emphasis supplied).

On the surface, the *Alexander* rule (that Commission can wholly disbelieve uncontradicted and unimpeached testimony) may seem polar to the rule stated in *Corp*, but it is not as the rules are compatible. If the Commission expressly declares that it disbelieves uncontradicted or unimpeached testimony, or if reference to the award shows that Commission's disbelief of the employee or his doctor was the basis for the award, then the *Alexander* rule attends.

On the other hand, the *Corp* rule attends where the record is wholly silent

---

5. Another illustration is the Fund's reliance on a 1999 report by Dr. Olive, a treating physician. He gave the history of Employee's 1993 work-related accident, recounted the severe right hip pain she experienced therefrom, and her unsuccessful efforts at treatment and relief. He concluded that "she has a chronic pain syndrome[ ]" and "I don't feel that she is able to work because of this." The Fund cites this as evidence that Employee was totally disabled from the 1993 injury. It then relies on *Landman v. Ice Cream Special-*

*ties, Inc.*, 107 S.W.3d 240, 248 (Mo.banc 2003), for the proposition that "[i]f one injury alone results in permanent total disability the Second Injury Fund has no liability." Again, the fallacy in this argument is that, even assuming Dr. Olive's report could be treated as substantial evidence that the 1993 accident rendered Employee permanently and totally disabled, the Commission obviously did not find such evidence credible. This follows because it found the Fund liable, and that finding necessarily refutes the Fund's argument.

concerning the Commission's weighing of credibility. This is explained in *Merriman v. Ben Gutman Truck Serv., Inc.* 392 S.W.2d 292 (Mo.1965), as follows:

"*Reference to the award* ... shows that it was not made upon a ground of lack of credibility of claimant or his doctor, and neither was contradicted or impeached. There is no conflict in the evidence and the evidence as to [the] accident and injury is undisputed and uncontradicted. There is no suggestion that any of the testimony was contrary to physical fact. In such situation the commission may not arbitrarily disregard and ignore such testimony and evidence and substitute therefor their personal opinion unsupported by sufficient competent evidence....

"We find no dispute in the evidence here, and '[w]here the evidentiary facts are not disputed the award that should be entered by the ... Commission becomes a question of law and the Commission's conclusions are not binding on the appellate court.' *Corp* ..., 337 S.W.2d l.c. 258[7]."

*Id.* at 297 [8, 9] (citations omitted) (emphasis supplied).

Historically, the Commission has not been reluctant to exercise its "trier-of-fact" prerogative to disbelieve the testimony of witnesses, including medical witnesses and occupational experts, *and* in doing so, forcefully outline its reasons for not giving full credence to disbelieved witnesses. *See Raef v. Stock–Hartis, Inc.,* 416 S.W.2d 201, 206 (Mo.1967). Here, however, the final award is silent on any question of credibility. Moreover, the evidence does not show any reasonable or substantial basis for refusing to believe the uncontradicted testimony of Employee, or her Husband, or Dr. Vale. To the contrary, Commission repeatedly cited, and then used, Dr. Vale's testimony in drafting its

findings and conclusions. Such conduct bespeaks Commission's recognition and acceptance of Employee's evidence as credible, not a rejection thereof. As such, "[t]he only reasonable synthesis that can be resolved ... is that credibility was not an issue," *Id.* at 207, and that Commission decided that Employee was not permanently disabled despite uncontradicted, unimpeached testimony that the "combined impact of her multiple, significant medical condition" rendered her incapable of effectively competing in the open labor market.

■ On this record, the Commission's finding of no permanent total disability was one of ultimate fact, meaning that it was necessarily reached through application of rules of law, rather than by natural reasoning based on facts alone. *Merriman,* 392 S.W.2d at 297[7]; *Wiele v. National Super Markets, Inc.,* 948 S.W.2d 142, 145 (Mo.App.1997). An "ultimate fact" as thus defined is a conclusion of law, *Merriman,* 392 S.W.2d at 297[7], *Wiele,* 948 S.W.2d at 145, and conclusions of law are reviewed de novo. *Endicott v. Display Technologies, Inc.,* 77 S.W.3d 612, 615[1] (Mo.banc 2002); *Ikerman v. Koch,* 580 S.W.2d 273, 278 (Mo.banc 1979).

After repeated review of the entire record, we cannot find substantial and competent evidence to support the finding of the Commission that Fund is liable only for enhanced permanent partial disability of 7.5% of the body as a whole. The award denying compensation for permanent total disability is not supported by competent and substantial evidence on the whole record and is clearly contrary to the overwhelming weight of the evidence. The Commission's award, as it relates to the liability of the Second Injury Fund, is reversed, and the cause is remanded with directions to the Commission to enter a new award finding that Employee is permanently totally disabled and that the Sec-

ond Injury Fund is liable for the enhanced permanent total disability resulting from the combination of Employee's occupational disease incurred on September 2, 1994, and Employee's preexisting work and non-work-related conditions.

RAHMEYER, C.J.-P.J., and BATES, J., Concur.