John KAROUTZOS, Respondent,

v.

TREASURER OF the STATE
of Missouri, Appellant.

No. WD 59116.

Missouri Court of Appeals,
Western District.

Sept. 25, 2001.

**494**

Jeremiah W. (Jay) Nixon, Atty. Gen., Jefferson City, Bruce R. Levine, Christopher R. Smith, Asst. Attys. Gen., Kansas City, for Appellant.

David H. Johnson, Loughlin, Cambell & Johnson, Kansas City, for Respondent.

Before LOWENSTEIN, P.J., ULRICH and HARDWICK, JJ.

HAROLD L. LOWENSTEIN, Judge.

The Treasurer of the State of Missouri, as custodian of the Second Injury Fund (Fund), appeals the decision from the Labor and Industrial Relations Commission (Commission) declaring the respondent, John Karoutzos, permanently and totally disabled. Under Missouri's Workers' Compensation Law, the Fund's liability for compensation is predicated on § 287.220, RSMo 2000,[1] and on a decision the claimant meets the definition of the term "total disability" set out in § 287.020.7, *infra.* The Fund's sole point on appeal is that the Commission erred in including the respondent's "sub-optimal command of the English language" in determining he was permanently and totally disabled. Because this court finds the record contained competent and substantial evidence that Karoutzos was permanently and totally disabled, within the meaning of the law, notwithstanding his English deficiency, the judgment is affirmed.

## Factual and Procedural History

Karoutzos was born in Greece in 1943 and began his career as a woodworker while a teenager there. After two years of service in the Greek army, he began to concentrate almost exclusively on cabinet-making.

Karoutzos immigrated to the United States in 1970. From 1972 until January 30, 1995, Karoutzos worked full time for Quality Wood Products, Inc. (Quality Wood) building custom furniture. In 1984, Karoutzos sustained a severe crushing injury to four fingers on his *left* hand while working at Quality Wood. He settled with Quality Wood for seventy-five percent permanent partial disability (or thirty-three percent permanent partial disability to the body as a whole) and resumed working at

1. All further statutory references are to RSMo 2000, unless otherwise indicated.

Quality Wood but was unable to use the fingers of his left hand.

On January 30, 1995, Karoutzos amputated his *right* thumb with a saw while working at Quality Wood. Karoutzos underwent re-plantation of his thumb shortly thereafter, but doctors concluded that this surgery was unsuccessful because the thumb appeared gangrenous or necrotic (gray-black skin covered the entire thumb). After several surgeries and procedures, Karoutzos pursued the option of a prosthetic device, but that too proved unsuccessful.

One of Karoutzos's doctors was Gary L. Baker, a plastic, reconstructive and hand surgery specialist. Baker saw Karoutzos several times. In June of 1995, Baker evaluated Karoutzos for the necrotic dry gangrene in his right thumb and for mild carpal tunnel syndrome in his right wrist. On July 21, 1995, Baker released Karoutzos from his care with sedentary work restrictions for four weeks ("Sedentary work: lifting 10 lbs. maximum and occasionally lifting or carrying articles up to 5 lbs."). On August 7, 1995, Baker changed the work restriction from sedentary to light ("Light work: lifting 20 lbs. maximum with frequent lifting and carrying objects weighing up to 10 lbs.") for four weeks. Baker recommended that Karoutzos be referred to a physiatrist (a doctor of physical medicine and rehabilitation) to determine whether he could return to cabinetmaking, noting that Karoutzos seemed "uncomfortable" and had a "great deal of reservation" about returning to work. Baker recommended that Karoutzos return to regular duty starting September 18, 1995 (half days for two weeks before returning to full days).

On October 30, 1995, Karoutzos was evaluated by Jane Deubler–White, who works in the field of vocational rehabilitation for the Rehabilitation Institute. Deubler–White administered a non-verbal, non-cultural measure of Karoutzos' intellectual function and concluded that he was in the low-average range, though his score may have been hampered by his difficulty in grasping a pencil. From three other tests administered to measure arithmetic, vocabulary, reading, and spelling, Deubler White concluded that Karoutzos functions at the borderline/low end of the low-average range or at approximately the fifth- to sixth-grade level. Karoutzos next did well on an untimed spatial relationship test. Deubler–White also attempted to administer the Minnesota Rate of Manipulation Test, which consisted of five different subtests where Karoutzos was directed to pick up and manipulate wooden disks. Because Karoutzos demonstrated signs of pain and fatigue, Deubler–White discontinued the test. Among other tests, Deubler–White conducted a "currency analysis" test where Karoutzos was required to count money and then transcribe the amount onto a form. Karoutzos performed above average on that test, with the exception that he left two coins in the envelope because apparently he was unable to open the little envelope and dump out the toy money. On various other tests including mechanical drawing, purchase-order sorting and assembly-line work, Karoutzos performed above average, but his work speed was "below competitive average."

Deubler–White's recommendations included that Karoutzos see a physiatrist, that he have a driving evaluation and adaptive equipment because he could not grasp the steering wheel, that he have an eye examination, that he take English as a Second Language classes, and that he pursue a G.E.D. She noted that she thought he had "some potential" in pursuing a G.E.D. as a long-range option of more than three to five years, but whether he could obtain a G.E.D. was "speculation" and she

"really [didn't] know." Deubler–White was also concerned about his emotional adjustment to his disability in that he seemed frustrated and fearful. Given his injuries, his language deficiencies, his lack of a G.E.D., his pain, and especially his work speed, Deubler–White had concerns that he would have difficulty finding a job. However, because Karoutzos indicated that he wanted to work, Deubler–White made some suggestions for potential jobs that he could perform if he had "significant accommodations, a very understanding supervisor and a remarkable job placement expert," but that absent any of those elements, "he would have a very difficult time in the job market." Those jobs were: parking lot attendant, security monitor, cashier (but only in a light setting where speed is not a factor and where he would not pick up groceries), furniture refinisher (but only where speed is not a factor), quality control inspection, and rental clerk.

As Baker and Deubler–White recommended, on January 9, 1996, Karoutzos saw Dr. James S. Zarr, a physiatrist. Zarr concluded that Karoutzos had reached "maximum medical improvement." He released Karoutzos to return to work effective the next day with the following permanent restrictions: no lifting or carrying greater than forty pounds; no lifting with the right hand greater than twenty pounds; no lifting with the left hand greater than thirty pounds; only frequent fine motor assembly or tool use with the right hand.

On April 17, 1996, Rita Millner met Karoutzos at Quality Hill to evaluate three potential jobs for him. Millner is employed in the field of vocational rehabilitation at the Rehabilitation Institute. Millner works with clients at the institute and at their job site to determine which jobs may be appropriate for disabled individuals. She takes into consideration a job's physical requirements and the person's age, training, intellectual capacity, vocabulary skills, et cetera, in order to place a client with a job. Also present when Millner met with Karoutzos were Jim French, the nurse case manager for Comp Care (the workers' compensation insurance carrier) and Don Mayfield, a supervisor at Quality Hill. As to the first potential job, "rough cutting panels," Millner concluded that Karoutzos "would have significant difficulties" because it required continual use of upper extremities for grasping and reaching and carrying the boards back and forth. Her concern was with Karoutzos continuously bending over, picking up and moving boards and having to grasp and carry them. The second potential job was "marking face frames." Again, Millner noted that Karoutzos experienced "significant difficulty grasping, reaching down, grabbing a pencil." Karoutzos also had difficulty maneuvering and holding the tape measure, pulling it out, holding it in place and marking the boards. Millner felt that work pace might be an issue. The third potential job was "drilling face frames." Millner did not actually observe Karoutzos in this task, but testified that he would have problems because it would require dexterity to pick the boards up, hold them in place and line them on the guide. She noted overall that Karoutzos needed an eye examination and that his work pace was "below competitive standards" such that it could be a "significant issue."

French "was somewhat disappointed" in Millner's job analysis. In correspondence to Comp Care, he wrote that "[i]t seems to me that Mr. Karoutzos is for some reason or another purposefully not using [the middle and index fingers of his right hand] in any of his activities." French wrote that Millner asked Karoutzos whether he could perform a certain task, rather than observing herself whether he could perform it. French felt that Karoutzos could perform

the job duties within Zarr's restrictions and that he could be "totally accommodated to his physical needs."

Dr. Steven Hendler, a physiatrist with the Rehabilitation Institute, examined Karoutzos on January 24, 1996, and on February 25, 1998. Among other things, Hendler concluded there was an impairment of the right hand combined with carpal tunnel to equate to a twenty-four percent whole person, permanent partial disability to the body as a whole. He also concluded that the deficits in the left hand equated to a rating of thirty-three percent to the body as a whole. Taking into account his two examinations of Karoutzos, the reports of Deubler–White and Millner, Karoutzos' education level, his language abilities and his age, Hendler concluded that Karoutzos "would not be able to perform work in the competitive marketplace" and that he is "permanently and totally disabled from employment."

Hendler testified that Karoutzos would not be able to work as a parking lot attendant because of dexterity loss and difficulties handling coins. Hendler also testified that Karoutzos would not be able to work as a night watchman or security guard because of his education level, his reasoning abilities and his loss of dexterity. Finally, Hendler testified that Karoutzos' ability to be retrained in other fields would be "very poor" based on the physical examinations, Karoutzos' command of English, his education level, and the tests performed by Deubler–White.

In October 1995 (prior to the April 17, 1996, meeting with French and Millner), Karoutzos testified that he tried for two weeks to work at Quality Hill. He could not hold spray guns or tools or boards because he could not grip with his left hand. He could not handle screws, nails, pencils, rulers, sandpaper, staples, straight edges and squares. He testified that there was nothing he could do confidently for Quality Hill. He testified that his problems were related to his "inability to do fine twisting, turning, lifting and touching" with his hands. He could not grip with his left hand and could only grip with his right hand between the fingers; he demonstrated attempts to hold tools to the ALJ. He testified that he had pain in his elbows, wrists and back. He also testified that he obtained reading glasses, but they did not help him in the woodworking field and that he has not been able to get a job elsewhere. He could not work the buttons on his shirt or push buttons on a regular or cell phone.

English proficiency was not a requirement when Karoutzos worked at Quality Hill because the job required working alone in a noisy atmosphere. Karoutzos, however, did testify in English and testified that he speaks with his wife and children in English, though the record reflected that the court had difficulty understanding him at several instances. In the award against the Fund, the Administrative Law Judge (ALJ) noted Karoutzos' difficulty with the English language several times. For example, the ALJ wrote: "[Karoutzos] has had no formal training in English and . . . although he understood English well enough to understand what was happening in court that day, . . . he has difficulty understanding people in general and vice versa." She also wrote: "With regard to the vocational problems, specifically Claimant's lack of ability to speak fluent English, I find that this would be considered a disability and was also a hindrance to his employment." In addition, the ALJ concluded: "I further find that Claimant's sub-optimal command of the English language, as well as his limited educational level, his limited academic abilities, including borderline reading skills, deficient spelling,

and borderline arithmetic skills, were an actual hindrance to his employment prior to his injury to his right hand. ..." The ALJ's award also reflected careful detail to the medical evidence presented.

The Commission affirmed the ALJ's award. This appeal follows.

### Standard of Review

■ Review of a workers' compensation claim is a two-step process:

In the first step, the court examines the whole record, viewing the evidence and all reasonable inferences drawn therefrom in the light most favorable to the award, to determine if the record contains sufficient competent and substantial evidence to support the award. If not, the Commission's award must be reversed. If there is competent and substantial evidence supporting the award, the court moves to the second step, where it views the evidence in the light most favorable to the award, but must consider all evidence in the record, including that which opposes or is unfavorable to the award, take account of the overall effect of all of the evidence, and determine whether the award is against the overwhelming weight of the evidence.

*Avery v. City of Columbia,* 966 S.W.2d 315, 320 (Mo.App.1998) (quoting *Davis v. Research Med. Ctr.,* 903 S.W.2d 557, 571 (Mo.App.1995)). This court reviews the findings of the Commission and not those of the ALJ. *Bloss v. Plastic Enters.,* 32 S.W.3d 666, 670 (Mo.App.2000).

### Analysis

■ In its sole point, the Fund argues that the Commission's finding (which incorporated by reference the ALJ's opinion) that Karoutzos is permanently and totally disabled due to a combination of his physical injuries and his "sub-optimal command

of the English language" was unsupported by the weight of the evidence in that: 1) the evidence does not show that Karoutzos was disabled by his poor English skills, and 2) Karoutzos' sub-optimal command of English is not a permanent condition and therefore not a disability pursuant to § 287.020.

■ In order to recover from the Fund, a claimant must first prove a pre-existing permanent partial disability whether from compensable injury or otherwise, pursuant to § 287.220.1. The permanent disability pre-dating the injury in question must "exist at the time the work-related injury was sustained and be of such seriousness as to constitute a hindrance or obstacle to employment or re-employment should the employee become unemployed." *Messex v. Sachs Elec. Co.,* 989 S.W.2d 206, 214 (Mo.App.1999). In this case, Karoutzos sustained a severe crushing injury to four fingers on his left hand while working at Quality Wood in 1984, and the Fund does not contest that this injury qualifies as a pre-existing injury under § 287.220.1.

■ Second, "a preexisting disability must combine with a disability from a subsequent injury in one of two ways: (1) the two disabilities combined result in a greater overall disability than that which would have resulted from the new injury alone and of itself; or (2) the preexisting disability combined with the disability from the subsequent injury to create permanent total disability." *Reese v. Gary & Roger Link, Inc.,* 5 S.W.3d 522, 526 (Mo.App. 1999) (citation omitted). There are no specific requirements when the pre-existing disability and the primary injury combine to cause permanent total disability. *Id.*

■ Total disability is defined as the inability to return to any employment and not merely the employment in which the employee was engaged at the time of the

accident. § 287.020.7. "The test for permanent total disability is the worker's ability to compete in the open labor market in that it measures the worker's potential for returning to employment." *Reese*, 5 S.W.3d at 526. "The critical question then becomes whether any employer in the usual course of employment would reasonably be expected to hire this employee in his or her present physical condition." *Id.*

■■■ "The Workers' Compensation Law should be interpreted in a liberal manner in favor of the employee." *Avery*, 966 S.W.2d at 320. "Questions regarding the right of the employee to benefits must be resolved in the injured employee's favor." *Id.* Although the record and the ALJ's award are replete with references to Karoutzos' problems with English, the evidence is sufficient and substantial to establish that he has suffered a total and permanent disability notwithstanding his language difficulties. The 1984 injury severely limited Karoutzos' use of his left hand. The 1995 injury left Karoutzos without the ability to grip or carry instruments and tools, as detailed *supra*. Moreover, Karoutzos had mild carpal tunnel syndrome and pain in his elbows, wrists and back. And although Karoutzos sought suggestions for job alternatives from Deubler–White, Hendler concluded that none of these suggestions would be feasible for Karoutzos. The combined effect of these injuries, as most professionals testified over and over again, was that Karoutzos either would require substantial accommodations or that he could not perform at all in a competitive work environment. Further, as the Fund noted, it is appropriate to consider a claimant's physical condition, age, education, job experience and skills, most of which are problematic for Karoutzos. *Tiller v. 166 Auto Auction*, 941 S.W.2d 863, 866 (Mo.App.1997) (age is an appropriate consideration in determining total disability, but illiteracy is inappropri-

ate where it is a result of lack of education and not lack of ability to learn); *Olds v. State of Mo., Treasurer*, 864 S.W.2d 406, 408 (Mo.App.1993) (age, limited education and lack of training to do anything but truck driving were appropriate considerations for permanent and total disability). In short, there is no indication that any reasonable employer would hire Karoutzos in his present physical condition.

An examination of the record as a whole, including evidence unfavorable to the Commission's decision, indicates that the award is not against the overwhelming weight of the evidence, as dictated in the *Davis* standard of review. 903 S.W.2d at 571. Although the Commission's consideration of Karoutzos' deficient English skills as a component of finding permanent total disability was improper, the rest of the record reflects sufficient, competent and substantial evidence to support an award of total disability.

The judgment is affirmed.

All concur.