Edward DUNN, Jr., Appellant,

v.

TREASURER OF MISSOURI AS CUSTODIAN OF SECOND INJURY FUND, Respondent.

No. ED 90615.

Missouri Court of Appeals,
Eastern District,
Division One.

Sept. 30, 2008.

Motion for Rehearing and/or Transfer to Supreme Court Denied Nov. 13, 2008.

Application for Transfer Denied
Jan. 27, 2009.

Matthew J. Sauter, Saint Louis, MO, for Employee/Appellant.

Jeremiah W. (Jay) Nixon, Atty. Gen., Da–Niel Cunningham, Assistant Attorney General Saint Louis, MO, for Respondent.

## OPINION

GLENN A. NORTON, Judge.

Edward Dunn, Jr. ("Claimant") appeals the denial by the Labor and Industrial Relations Commission ("Commission") of permanent total disability benefits against the Second Injury Fund ("SIF"). The Commission affirmed the Administrative Law Judge's ("ALJ") decision awarding Claimant permanent partial disability benefits from the SIF for a right shoulder injury that occurred in 2001, and denying permanent total disability benefits for that same injury. We affirm.

## I. BACKGROUND

Claimant began working for Astoris[1] ("Employer") in 1981. Claimant had various jobs while working for Employer, many of which included heavy lifting. In the early 1990's, Claimant transferred to a control room job where he was able to work at a desk with a helper doing most of the required checks outside of the control room. The heaviest object that Claimant was required to lift while working the control room job was a clipboard.

In March 2001, Claimant injured his right shoulder while at work ("2001 Injury"). Claimant had several injuries and medical problems throughout the twenty years prior to the 2001 Injury. These pre-existing injuries and disabilities consisted of injuries to his right shoulder,[2] his left knee, his lower back, and three heart-attacks.

Following the 2001 Injury, Dr. Michael Nogalski performed surgery on Claimant's right shoulder to repair the torn rotator cuff which resulted from the 2001 Injury. In June 2001, Claimant went to see Dr. Herbert Haupt for further treatment. After a brief period of treatment, Dr. Haupt operated on Claimant's right shoulder to repair his rotator cuff in September 2001. Claimant complained of more pain in his right shoulder, and Dr. Haupt operated on him again in October 2001. After the third surgery related to the 2001 Injury, Claimant continued to have problems with his right shoulder, but Dr. Haupt recommended against further surgeries. In April 2002, Dr. Haupt found that Claimant had reached maximum medical improvement, and released Claimant back to work with specific and detailed permanent lifting restrictions. Dr. Haupt rated Claimant's right shoulder at 25% permanent partial disability for the 2001 Injury and at 5% permanent partial disability for the previous injury, totaling 30% permanent partial disability for Claimant's right shoulder. Claimant did not return to work after this second surgery, but instead decided to retire.

In May 2002, Claimant was evaluated by Dr. J.H. Morrow. Dr. Morrow concluded that Claimant was at 85% permanent partial disability for his right shoulder. Dr. Morrow attributed 20% of the permanent partial disability to the first right shoulder injury, and 65% to the 2001 Injury. Dr. Morrow also recommended more restrictions on Claimant's use of the right shoulder, but deferred to a vocational rehabilitation expert to determine Claimant's employability. Further, Dr. Morrow opined that Claimant's right shoulder disability, combined with Claimant's other medical disabilities, would provide a greater overall disability rating than the simple sum of his injuries and disabilities.

---

1. The company name has changed during a series of buyouts over the past 20 years.

2. Claimant injured his right shoulder in 1982 when he fell and collided with a motor. Following surgery, he was able to return to work with restrictions.

In 2004, Dr. Adeluola G. Lipede examined Claimant at the request of Claimant's attorney. At this examination, Dr. Lipede determined that Claimant had the following permanent partial disability ratings: 78% of the right shoulder; 25% of the right thumb; 25% of the right knee; 10% of the total person for the low back; 10% of the total person for gout; 45% of the total person for chronic heart problems; 35% of the total person for chronic obstructive pulmonary disease; 50% of the total person for cardiopulmonary dysfunction; and 25% of the total person for depression related to illnesses and inability to engage in daily living and gainful employment. Dr. Lipede did not explain how much of the pre-existing right shoulder injury accounted for the 78% permanent partial disability rating for the right shoulder.

Claimant returned to Dr. Lipede in 2006 for another examination. Dr. Lipede's conclusions from this examination are reflected in a letter to Claimant's attorney dated April 4, 2006. Dr. Lipede found little change from his previous determinations of permanent partial disability; however, he did find that Claimant had an observable increase in his limitations and a decrease in his tolerance for work and exercise. Dr. Lipede found a number of limitations that had developed since he had seen Claimant in 2004, including: a decrease in the amount of time that Claimant could spend standing, walking, and sitting; and a decrease in Claimant's ability to lift and carry objects over ten pounds, to reach over his head, to drive, and to type with his right hand.

In 2005, Claimant was evaluated by Mr. James England, a rehabilitation counselor. Upon a review of the restrictions Drs. Haupt, Morrow, and Lipede had placed on Claimant, Mr. England concluded in his Vocational Rehabilitation Evaluation that Claimant would probably be unable to compete in the open labor market. Specifically, Mr. England stated in the Summary and Conclusions section of his Vocational Rehabilitation Evaluation that:

> [Claimant] had an extensive work history as a chemical operator which was a rather sedentary position overall with only some occasional light level activity. Unfortunately, he reached the point where he could not longer [sic] sustain even that level of activity. He indicated that had he been able to function at a sedentary to light level on a consistent basis he would still be trying to do that type of work.
>
> As he appears to be functioning and considering his combination of medical problems I do not believe that he is likely to be able to successfully compete for employment or to sustain it in the long run.

After filing a worker's compensation claim, Claimant requested a hearing to determine the extent to which he was entitled to worker's compensation benefits from Employer and the SIF. Before the hearing, Claimant and Employer entered into a settlement agreement.

The hearing went forward on February 14, 2007, in order to determine whether and to what extent the SIF was liable to Claimant. At the hearing, Claimant provided live testimony. He testified about, *inter alia*, his employment history and his pre-existing injuries. In addition, Claimant offered several exhibits into evidence, including, but not limited to: (1) Dr. Nogalski's records; (2) Dr. Haupt's records; (3) Dr. Morrow's report; (4) Dr. Lipede's deposition; (5) exhibits relating to Dr. Lipede's deposition, including his April 4, 2006 letter setting out his conclusions from his 2006 evaluation of Claimant; (6) Mr. England's deposition; and (7) exhibits relating to Mr. England's deposition, includ-

ing his Vocational Rehabilitation Evaluation. Dr. Lipede stated in his deposition that the combined sum of Claimant's 2001 Injury to his right shoulder, pre-existing right shoulder injury, chronic obstructive pulmonary disease, coronary artery disease, and knee disabilities are greater than their simple sum. Dr. Lipede also testified that Claimant was not employable due to the restrictions prescribed by Drs. Nogalski and Haupt, despite the fact that neither of the two doctors found that Claimant was unemployable.[3] Mr. England testified in his deposition that, even though Claimant was willing to work, he would probably be unable to compete in the open labor market and that it would be "unlikely that an employer would want to hire [Claimant] given his age and medical history." The SIF did not present any witnesses or expert testimony, and did not offer any exhibits into evidence.

After the conclusion of the hearing, the ALJ found that Claimant had the following permanent partial disability ratings: 20% of the right shoulder, 25% of the left knee, 25% of the body for heart problems, and 12.5% of the body for chronic obstructive pulmonary disease. The ALJ also found that the pre-existing conditions in combination with the 2001 Injury created a substantially greater disability than the simple sum, and applied a 10% load factor. Accordingly, the ALJ awarded Claimant 34.66 weeks of permanent partial disability benefits from the SIF. The ALJ made express credibility determinations with respect to Dr. Lipede's and Mr. England's deposition testimonies regarding Claimant's employability, finding that Dr. Lipede's testimony was "not persuasive" and that Mr. England's testimony "lacked

foundation" and was "not credible."[4] Therefore, the ALJ found that Claimant did not prove that he was unable to compete in the open labor market at the time Dr. Haupt determined that Claimant was at maximum medical improvement, and thus, Claimant was not entitled to permanent total disability benefits from the SIF.

Claimant then filed an application for review with the Commission. The Commission affirmed and adopted the ALJ's award. Claimant appeals.

## II. DISCUSSION

### A. Standard of Review

On appeal, we review only questions of law and may modify, reverse, remand for rehearing, or set aside the Commission's award only on the grounds:

(1) That the [C]ommission acted without or in excess of its powers;

(2) That the award was procured by fraud;

(3) That the facts found by the [C]ommission do not support the award; [or]

(4) That there was not sufficient competent evidence in the record to warrant the making of the award.

Section 287.495.1 RSMo 2000.[5] We review the decision of the ALJ as adopted by the Commission. *Reidelberger v. Hussman Refrigerator Co.,* 135 S.W.3d 431, 433 n. 2 (Mo.App. E.D.2004).

### B. The Commission Did Not Err in Denying Claimant Permanent Total Disability Benefits

In his sole point on appeal, Claimant argues that the Commission erred in deny-

---

3. Dr. Lipede's deposition testimony will be quoted below in Section B(3)(b).

4. The ALJ's explanation for these findings will be discussed below in Section B(2).

5. All statutory references are to RSMo 2000.

ing him permanent total disability benefits. We disagree.

### 1. SIF Liability

A claimant in a worker's compensation proceeding has the burden of proving all elements of his claim to a reasonable probability. *Cardwell v. Treasurer of State of Missouri*, 249 S.W.3d 902, 911 (Mo.App. E.D.2008). In order for a claimant to recover against the SIF, he must prove that he sustained a compensable injury, referred to as "the last injury," which resulted in permanent partial disability. Section 287.220.1. A claimant must also prove that he had a pre-existing permanent partial disability, whether from a compensable injury or otherwise, that: (1) existed at the time the last injury was sustained; (2) was of such seriousness as to constitute a hindrance or obstacle to his employment or reemployment should he become unemployed; and (3) equals a minimum of 50 weeks of compensation for injuries to the body as a whole or 15% for major extremities. *Id.; Cardwell*, 249 S.W.3d at 906–07; *Karoutzos v. Treasurer of State*, 55 S.W.3d 493, 498 (Mo.App. W.D. 2001), *overruled on other grounds by Hampton v. Big Boy Steel Erection*, 121 S.W.3d 220, 223 (Mo. banc 2003). In this case, the SIF does not dispute that Claimant has met his burden in proving all of the above elements. Rather, the SIF and Claimant disagree as to what type of benefits Claimant is entitled to recover from the SIF; the SIF maintains that Claimant is only entitled to permanent partial disability benefits, while Claimant contends he is entitled to permanent total disability benefits.

The type of benefits that a claimant is entitled to recover from the SIF depends on the resulting combination of claimant's last injury and pre-existing permanent partial disabilities. *See Elrod v. Treasurer of Missouri as Custodian of the Second Injury Fund*, 138 S.W.3d 714, 717–18 (Mo. banc 2004); *See also Karoutzos*, 55 S.W.3d at 498 (stating that the last injury and pre-existing disabilities can combine in one of two ways); Section 287.220.1. In order for a claimant to be entitled to recover permanent partial disability benefits from the SIF, he must prove that the last injury, combined with his pre-existing permanent partial disabilities, causes greater overall disability than the independent sum of the disabilities. *Elrod*, 138 S.W.3d at 717. On the other hand, in order for the claimant to be entitled to recover permanent total disability benefits from the SIF, he must prove that the last injury, combined with his pre-existing permanent partial disabilities, result in permanent total disability. *See id.* at 717–18 (finding that the claimant did not prove she was entitled to permanent total disability benefits against the SIF when she presented no evidence that her last injury and pre-existing permanent partial disabilities combined to make her totally disabled); Section 287.220.1.

The issue in this case is whether Claimant is entitled to recover permanent total disability benefits from the SIF, and specifically, whether Claimant has proven that his 2001 Injury, combined with his pre-existing permanent partial disabilities, result in permanent total disability. "The test for permanent total disability is the worker's ability to compete in the open labor market in that it measures the worker's potential for returning to employment." *Knisley v. Charleswood Corp.*, 211 S.W.3d 629, 635 (Mo.App. E.D.2007) (internal quotation omitted). The primary inquiry is whether an employer can reasonably be expected to hire the claimant, given his present physical condition, and reasonably expect the claimant to successfully perform the work. *Id.*

### 2. The *Alexander* Rule

■■ Pursuant to the rule set forth in *Alexander v. D.L. Sitton Motor Lines,* 851 S.W.2d 525, 527 (Mo. banc 1993), *superseded by statute on other grounds,* the Commission is free to accept or reject uncontradicted and unimpeached testimony. When the Commission expressly declares that it disbelieves uncontradicted or unimpeached testimony, then we must apply the *Alexander* rule and defer to the Commission's credibility findings. *Id.*; *Highley v. Von Weise Gear,* 247 S.W.3d 52, 56–57 (Mo.App. E.D.2008).

**3. Because the *Alexander* Rule Applies, we Must Defer to the Commission's Credibility Determinations**

Claimant presented the testimony of Dr. Lipede and Mr. England to prove that he was unable to compete in the open labor market. Dr. Lipede testified that Claimant was not employable. Mr. England testified that Claimant would probably be unable to compete in the open labor market and that it would be "unlikely that an employer would want to hire [Claimant] given his age and medical history." The ALJ found that Dr. Lipede's testimony was "not persuasive" and that Mr. England's testimony "lacked foundation" and was "not credible."

**a. The ALJ's Finding that Dr. Lipede's Testimony was "Not Persuasive"**

■ The ALJ found that Dr. Lipede's testimony that Claimant was not employable was "not persuasive" because: (1) it was based on an examination of Claimant after he had undergone multiple surgeries unrelated to the 2001 Injury; (2) it was based on restrictions set by Claimant's previous doctors who found that Claimant was still employable; and (3) Dr. Lipede was not a vocational specialist. Because it is undisputed that the ALJ's first and third bases for finding that Dr. Lipede's testimony was "not persuasive" are supported by the record, we will limit our discussion to the ALJ's second basis for its finding.

The following exchange between the SIF's counsel and Dr. Lipede during Dr. Lipede's deposition reveals that the ALJ's second basis for its finding that Dr. Lipede's testimony was "not persuasive" is supported by the record.

Q: And in your review of the medical records, as far as the treating physicians—and I guess that would includes Nogalsky [sic] and Haupt—it was Dr. Haupt who was the only treating physician that placed permanent restrictions regarding this gentleman, is that correct?

A: No, that's not correct.

Q: Okay.

A: Nogalsky [sic] did and Haupt did.

Q: Now, Nogalsky [sic], as far as the limit or use of his arm, imposed restriction and indicated that he should be limited to light duty. What other restriction did Nogalsky [sic] impose?

A: Working above his head.

Q: Okay. But neither of those doctors came to the conclusion that this gentleman was not able to do any type of work, is that correct—that he was unable to work?

A: *The amount of restrictions—the amount of restrictions placed on him was such that he was not employable.*

Q: *But neither Dr. Haupt nor Dr. Nogalsky [sic] made that conclusion that he was unemployable, correct?*

A: *Yeah. They didn't write that down but they imposed severe restrictions on him.*

(emphasis added). We find that the above testimony demonstrates that Dr. Lipede's testimony that Claimant was not employa-

ble was based on restrictions set by Dr. Haupt and Dr. Nogalski, Claimant's previous doctors who found that Claimant was still employable.[6] Thus, the ALJ's finding with respect to Dr. Lipede's testimony is supported by the record.

### b. The ALJ's Finding that Mr. England's Testimony "Lacked Foundation" and was "Not Credible"

■ The ALJ found that Mr. England's testimony that Claimant would probably be unable to compete in the open labor market "lacked foundation" and was "not credible" because: (1) it was based on Claimant's statement that he would have continued working if he were able to do so consistently; (2) he interviewed Claimant more than three years after Claimant was released at maximum medical improvement and after Claimant underwent multiple surgeries unrelated to the 2001 Injury; and (3) he only interviewed Claimant once. Because it is undisputed that the ALJ's second and third bases for finding that Dr. Lipede's testimony was "not persuasive" are supported by the record, we will limit our discussion to the ALJ's first basis for its finding.

The Summary and Conclusions section of Mr. England's Vocational Rehabilitation Evaluation reveals that the ALJ's first basis for its finding that Mr. England's testimony "lacked foundation" and was "not credible" is supported by the record. The Summary and Conclusions section provides:

> [Claimant] had an extensive work history as a chemical operator which was a rather sedentary position overall with only some occasional light level activity. Unfortunately, he reached the point where he could not longer [sic] sustain even that level of activity. He indicated that had he been able to function at a sedentary to light level on a consistent basis he would still be trying to do that type of work.
>
> As he appears to be functioning and considering his combination of medical problems I do not believe that he is likely to be able to successfully compete for employment or to sustain it in the long run.

Mr. England relied on and referred to his Vocational Rehabilitation Evaluation when he testified in his deposition. We find that the portion of the Vocational Rehabilitation Evaluation quoted above demonstrates that Mr. England's testimony that Claimant would probably be unable to compete in the open labor market was based, at least in part, on Claimant's statement that he would have continued working if he were able to do so consistently.[7] Thus, the ALJ's finding with respect to Mr. England's testimony is supported by the record.

### c. Conclusion

---

**6.** The dissent contends that "a review of the record reveals that Dr. Lipede's findings with respect to Mr. Dunn's 'ability to stand, walk, sit and lift' were based upon a 'kinesiological analysis' involving weighted walking, lifting, pushing and pulling" and reveals that Dr. Lipede did not take into account permanent restrictions imposed by other medical doctors. We find that a close review of Dr. Lipede's deposition, viewed in conjunction with his April 4, 2006 letter written following his 2006 examination of Claimant, reveals *only* that Dr. Lipede *did not rely on restrictions imposed by other doctors when he performed the kinesiological analysis in order to re-evaluate Dunn's ability to stand, walk, sit and lift.*

**7.** Although it is true that Mr. England also stated in his deposition that he *"felt* that [the combination of problems Claimant had] would negate [Claimant's] ability to do even sedentary work on a consistent basis," pursuant to the *Alexander* rule the Commission was not required to believe Mr. England's uncontradicted and unimpeached feelings. *Alexander,* 851 S.W.2d at 527.

The ALJ found that Dr. Lipede's testimony that Claimant was not employable was "not persuasive" and found that Mr. England's testimony that Claimant would probably be unable to compete in the open labor market was "not credible." Because the Commission expressly declared [8] that it disbelieved the testimony of Dr. Lipede and Mr. England, we must, pursuant to the *Alexander* rule, defer to the Commission's credibility determinations.[9] *Alexander*, 851 S.W.2d at 527; *Highley*, 247 S.W.3d at 56–57.

**4. Claimant has Failed to Satisfy his Burden of Proof**

 Claimant has the burden of proving all elements of his claim for permanent total disability benefits. Accordingly, the SIF does not have any obligation to present contrary or conflicting evidence with regard to Claimant's claim for permanent total disability benefits. Because the testimonies of Claimant's experts were rejected by the Commission as "not persuasive" and "not credible," Claimant did not provide competent evidence to show that his 2001 Injury, combined with his pre-existing permanent partial disabilities, result in permanent total disability. Thus, Claimant has failed to satisfy his burden of proof, despite the fact that the SIF declined to present any evidence. The Commission did not err in denying Claimant permanent total disability benefits. *See*

*Schuster v. State of Missouri Division of Employment Security*, 972 S.W.2d 377, 381 (Mo.App. E.D.1998) (finding that the claimant was not entitled to permanent disability benefits before a particular date because the claimant failed to satisfy his burden of proof on the issue by providing competent evidence as to the date on which he became permanently and totally disabled). Claimant's point is denied.

**III. CONCLUSION**

The Commission's award denying Claimant permanent total disability benefits is affirmed.

KURT S. ODENWALD, P.J., concurs.

PATRICIA L. COHEN, J., dissents.

PATRICIA L. COHEN, Judge, dissenting.

I respectfully dissent. I would hold that the record does not contain sufficient competent and substantial evidence to support the Commission's determination that Mr. Dunn is not permanently and totally disabled. *See Hampton v. Big Boy Steel Erection*, 121 S.W.3d 220 (Mo. banc 2003).

At the time of the injury to his right shoulder in February 2001, Mr. Dunn, then a 56–year–old with a tenth grade education, had suffered three heart attacks, two arthroscopic left knee surgeries, and two right shoulder surgeries. He also

---

8. As stated above, the Commission adopted the ALJ's award.

9. The dissent cites *Houston v. Roadway Express, Inc.*, 133 S.W.3d 173, 180 (Mo.App. S.D.2004) for the proposition that the Commission's act in relying on part of Dr. Lipede's opinion when it came to the conclusion that Claimant's pre-existing conditions create a hindrance or obstacle to his employment or re-employment "bespeaks Commission's recognition and acceptance of Employee's evidence as credible, not a rejection thereof." But Houston is distinguishable be-

cause in that case, the final award was silent on the question of credibility. *Id.* In contrast, the final award in the instant case reveals that the Commission expressly declared that it disbelieved the testimony of Dr. Lipede and Mr. England with respect to their determinations that Claimant was permanently and totally disabled. Therefore, unlike in Houston, where there was no express finding as to credibility, here we are required to apply the *Alexander* rule and defer to the Commission's credibility findings.

was obese and suffered from COPD, gout, a herniated disc, low back pain, and sleeping problems. Following the 2001 injury, Mr. Dunn underwent three more unsuccessful surgeries on the injured right shoulder. The only two experts who provided opinions on employability in the open labor market, Dr. Lipede and James England, the vocational expert, opined that Mr. Dunn's preexisting injuries and disabilities combined with his 2001 injury to render him unemployable. The SIF proffered no contrary medical or expert testimony.

Our recent cases of *Highley v. Von Weise Gear*, 247 S.W.3d 52 (Mo.App. E.D. 2008) and *Richardson v. Missouri State Treasurer*, 254 S.W.3d 242 (Mo.App. E.D. 2008) provide the proper framework for analyzing this case. In *Highley*, we held unsupported by competent and substantial evidence the Commission's finding that the claimant's last injury combined with her prior disabilities did not render her unemployable in the open labor market. *Highley*, 247 S.W.3d at 56. We declined to apply the so-called *Alexander* rule in *Highley* because we concluded that the Commission did not make a credibility determination when it failed to resolve differences in the evidence in favor of the testimony of a particular expert, and instead merely pointed out "flaws" in the expert testimony. *Id.* at 57; *see also Corp v. Joplin Cement Co.*, 337 S.W.2d 252, 258 (Mo.1960) (holding that where the record "reveals no conflict in the evidence or impeachment of any witness, the reviewing court may find the award was not based upon disbelief of the testimony of the witnesses.").

Richardson expands upon *Highley* and illustrates the appropriate circumstances for application of the rule articulated in *Alexander*. In contrast to both *Highley* and this case, in *Richardson*, we premised our application of *Alexander* on the conclusion that Mr. England's opinion conflicted with the evidence of a testifying physician on the issue of whether the claimant was capable of employment: "Unlike the court in *Highley*, we are faced with contradictory testimony and a determination that one expert opinion is more 'persuasive' than the other based upon the evidence in the record as a whole. Therefore, we must follow the rule set forth in *Alexander* and leave the acceptance or rejection of medical evidence for the commission." Richardson, 254 S.W.3d at 245.

As in *Highley*, this record does not reveal any conflicts in the evidence on the issue of employability in the open labor market. The only two witnesses who testified on the issue of permanent disability opined that Mr. Dunn was unemployable. Furthermore, the flaws that the Commission identified in the expert testimony are not supported by the record. With respect to Mr. England, the Commission stated that Mr. England's opinion was not credible because it was based on Mr. Dunn's statement that "he would have continued working a sedentary to light job if he were able to do so consistently." However, a review of Mr. England's testimony reveals otherwise. Mr. England clearly based his opinion on the medical evidence and not on Mr. Dunn's view:

> But I think the combination of problems he had, including difficulty sitting long, difficulty using his arms effectively, the sleep deprivation at night, the difficulties then with staying awake when he is in a seated position during the day, I felt that would negate his ability to do even sedentary work on a consistent basis.

With respect to Dr. Lipede, the Commission stated that it found his testimony unpersuasive because it was based on the restrictions set by Dr. Nogalski and Dr. Haupt. However, a review of the record

reveals that Dr. Lipede's findings with respect to Mr. Dunn's "ability to stand, walk, sit and lift" were based upon a "kinesiological analysis" involving weighted walking, lifting, pushing and pulling. When Dr. Lipede was asked by the SIF's counsel whether he took into account "permanent restrictions imposed by other medical doctors, in particular, Dr. Haupt," he stated "No. We are blind to that when we are doing the analysis."[1] *See Zimmerman v. City of Richmond Heights*, 194 S.W.3d 875, 879 (Mo.App. E.D.2006) (reversing Commission's decision where Commission's finding as to expert's opinion was contradicted by expert's deposition testimony).

I am not persuaded by the Commission's use of the word "credible" and our consequent invocation of the *Alexander* rule when the record does not show any reasonable or substantial basis for refusing to credit the uncontradicted and unimpeached testimony of the only two experts testifying on the issue of employability in the open labor market. Where, as here, the Commission's determination is not supported by the record and is against the overwhelming weight of the evidence, it should be reversed.

---

1. It should also be noted that the Commission relied on Dr. Lipede's opinion when it came to the conclusion that "Claimant's pre-existing conditions to his right shoulder, left knee, heart and lungs create a hindrance or obstacle to Claimant's employment or re-employment." As the Southern District noted, "such conduct bespeaks Commission's recognition and acceptance of Employee's evidence as credible, not a rejection thereof." *Houston v. Roadway Express, Inc.,* 133 S.W.3d 173, 180 (Mo.App. S.D.2004).