Willie C. CLARK, Claimant–Appellant,

v.

MISSOURI STATE TREASURER AS CUSTODIAN OF the SECOND INJURY FUND, Respondent–Respondent.

No. SD 31644.

Missouri Court of Appeals, Southern District, Division Two.

Jan. 14, 2013.

Mark E. Moreland, St. Louis, MO, for Appellant.

Jonathan J. Lintner, Cape Girardeau, MO, for Respondent.

DON E. BURRELL, J.

Willie C. Clark ("Claimant") appeals the determination of the Labor and Industrial Relations Commission ("the Commission") that he was entitled to Second Injury Fund ("the Fund") benefits for permanent partial disability, rejecting Claimant's assertion that the combined result of "the primary injury" he suffered as a machine operator and his preexisting disabilities left him permanently and totally disabled.

Claimant asserts: 1) the Commission erred in finding that he "failed to meet his burden of proof" because it substituted its own opinion for "the opinions of uncontradicted medical experts"; and 2) the "overwhelming weight of the evidence establishe[d]" that he was permanently and totally disabled. Finding no merit in either claim, we affirm.

### Applicable Principles of Review

■ We must affirm the Commission's decision unless we find:

(1) That the commission acted without or in excess of its powers;

(2) That the award was procured by fraud;

(3) That the facts found by the commission do not support the award; [or]

(4) That there was not sufficient competent evidence in the record to warrant the making of the award.

Section 287.495.1.[1] "Our review of a workers' compensation award is limited to 'a single determination whether, considering the whole record, there is sufficient competent and substantial evidence to support the award.'" *Knisley v. Charleswood Corp.*, 211 S.W.3d 629, 633 (Mo.App. E.D. 2007) (quoting *Hampton v. Big Boy Steel Erection*, 121 S.W.3d 220, 223 (Mo. banc 2003)). "An award that is contrary to the overwhelming weight of the evidence is, in context, not supported by competent and substantial evidence." *Hampton*, 121 S.W.3d at 223.

■ "When the Commission affirms and adopts the [Administrative Law

---

1. All statutory references are to RSMo 2000.

Judge's ("ALJ")] award, we review the ALJ's findings as adopted by the Commission." *ABB Power T & D Co. v. Kempker,* 236 S.W.3d 43, 48 (Mo.App. W.D.2007). "The Commission is free to believe or disbelieve any evidence, and we defer to the Commission's credibility determinations and to the weight it accords testimony and evidence." *Treasurer of the State of Missouri–Custodian of the Second Injury Fund v. Cook,* 323 S.W.3d 105, 110 (Mo. App. W.D.2010); *see also Duever v. All Outdoors, Inc.,* 371 S.W.3d 863, 866 (Mo. App. E.D.2012) (the appellate court defers to the Commission's weight-of-the-evidence and witness-credibility determinations). The fact-finder may reject all or some of an expert's testimony that it does not find credible. *Pace v. City of St. Joseph,* 367 S.W.3d 137, 150 (Mo.App. W.D. 2012). Whether a claimant is permanently and totally disabled is a question of fact, not law. *Underwood v. High Road Indus., LLC,* 369 S.W.3d 59, 66 (Mo.App. S.D. 2012).

### Facts and Procedural Background

In May 2003, Claimant filed a claim[2] for compensation with the Division of Workers' Compensation ("the Division") for an injury he received to his "[l]ow back, right leg, neck, left shoulder and body as a whole" while working for Essex Electric ("Employer") on February 22, 2003. Claimant's testimony at the hearing on his claim was as follows. His job as a machine operator was to "put the raw copper wire on the rail and run it through a machine which lays the vinyl and the nylon onto the wire." After this process, the wire is rolled up onto "a smaller spool." His February 2003 injury happened while he was using a large wrench and "a metal pi[p]e" to loosen a locking mechanism on the machine. The effort required him to put the wrench "close to [his] neck and shoulder" and "lift up with [his] legs[.]" While he was trying to lift the wrench, his "back gave way." He left work and sought medical treatment. Claimant settled his claim against Employer "based upon approximate disability of 20% of [the] body as a whole."

Before his February 2003 injury, Claimant had two other documented work-related injuries and had developed diabetes. Claimant was injured in 1999 while working for Employer when a "reel" of wire weighing about fifteen hundred pounds came loose and rolled toward him. Claimant used his hands to keep the reel from smashing him. His back, shoulders, and one wrist were injured in that incident when he "flipped over the reel." After undergoing surgery on both shoulders, Claimant eventually returned to work. A "stipulation for compromise settlement" entered into evidence reflected disability levels of 30% for the right shoulder, 25% for the left shoulder, and 5% for the wrist as a result of the 1999 injury.

Claimant was diagnosed with diabetes in 2000, and he subsequently had diabetic episodes that caused him to miss work. At the time of his February 2003 injury, Claimant was only taking "pills" to manage his diabetes, but by the June, 2010 hearing, Claimant was taking insulin "on [an] as[-]needed basis" along with a couple of

---

**2.** The claim included an assertion of liability by the Fund for "permanent *partial* disability" (emphasis added). But at the Division hearing, the ALJ stated that two issues related to the Fund—permanent total disability and permanent partial disability—would be considered. The Fund apparently voiced no opposition to that expansion of Claimant's original claim for relief, and it does not assert in this appeal that Claimant waived any right he had to seek a finding that he was permanently and totally disabled because of his failure to assert it in his claim for benefits.

other medications. In April 2002, Claimant injured his back at work while he was "moving the reel" to a "payoff area[.]" A "stipulation for compromise settlement" admitted into evidence reflected a disability level of 3.25% for the body as a whole as a result of this injury.

After the February 2003 injury, Claimant "hurt [him]self again" at work, but he did not recall the details. He did not disagree with the May 14, 2003 medical notes of one of his treating physicians, Dr. Frank Petkovich, which stated that Claimant reported he had hurt himself at work on May 9, 2003, with pain developing in his neck and low back. Claimant admitted that he then "probably" told Dr. Petkovich on June 10, 2003 that he was back at work, but he hurt his back again the week before this appointment. He did not recall filing workers' compensation claims on these injuries, and he would not disagree if the Division said it had no records evidencing such claims.

Claimant recalled that Dr. Petkovich released him from care in December 2003. Claimant said that before his February 2003 injury, his "back was bad, but . . . [after he] had to try to break that nut loose, it was totally gone then." He testified, "There were times I couldn't even walk after that last injury." Claimant said that he had back pain before the "'03 injury" and afterwards it was "about the same maybe" and still "pretty bad." He also testified that he did not have numbness "before this last injury[,]" but at the time of the hearing "[i]t hurts every day. After that last injury . . . [he] ha[d] spells in which it would tighten up so bad where [he had] numbness coming down [his] leg[.]" As a result, he would "lay on the floor until [he] g[ot his] feelings back." Claimant testified that he no longer does the things he used to do at home, such as painting, cleaning, and repairing floors.

The medical records offered by Claimant from Petkovich Orthopedic and Spine Care, LLC were received into evidence as Exhibit E. The records reflect a patient visit by Claimant on March 7, 2003 regarding his February 2003 injury, accompanied by Dr. Petkovich's diagnosis of "acute muscular and ligamentous lumbosacral strain and a muscular cervical strain." The record for this visit stated that Claimant "may work with the restrictions that he not lift more than 10 to 15 pounds with his upper extremities and not do repetitive bending, stooping, kneeling or squatting." Dr. Petkovich's record for a March 17, 2003 follow-up visit also reflected that Claimant could work with nearly the same restrictions as March 7, 2003 concerning lifting, but it provided that he should "not do repetitive overhead work." Dr. Petkovich's May 5, 2003 record stated that Claimant was seen for follow up, given a prescription for pain, and was "encouraged to try and return to his regular job as tolerated. He was cautioned not to overdo it."

Dr. Petkovich's record dated May 14, 2003 reflects that Claimant was seen "with a new problem" and Claimant "state[d] he injured himself while at work on 5/9/03 when he was doing some loading and unloading and developed pain in his neck and lower back. He apparently was seen in at [sic] a local hospital emergency room and evaluated." Dr. Petkovich stated that the "condition is soft tissue in nature." Dr. Petkovich did not prescribe any further treatment or medications at that time.

Records from Dr. Petkovich indicate that Claimant was seen again on June 10, 2003, and Claimant "state[d] he injured his lower back again while at work last week, twisting some very heavy wire." Claimant's description of pain was recorded as "an aching type" in the "lower back with some occasional discomfort in his right

lower extremity." It was recorded at this visit that Claimant would "remain off work until he is seen in follow up." The record from a follow-up visit on June 24, 2003 stated that Claimant "may now return to light duty with the restrictions that he not lift more than 15–20 pounds and not do repetitive bending, stooping, kneeling or squatting."

In a December 10, 2003 letter to Employer's insurer—included in Claimant's Exhibit E—Dr. Petkovich stated that Claimant had

sustain[ed] a 3% permanent partial disability to the body as a whole as a result of his lumbosacral spine injury, which [Claimant] describe[d] as occurring at work on 2/22/03. . . . [H]e sustained a .5% permanent partial disability to the body as a whole as a result of his cervical spine injury, which he describe[d] as occurring at work on the same date. He was at maximum medical improvement as of 12/3/03.

Dr. Petkovich also stated that he told Claimant during his last visit on December 3, 2003 that "he could try to work on light duty with the restrictions that he not lift more than 35–40 pounds and not do repetitive bending, stooping, kneeling or squatting." He also informed Claimant "that ultimately he should be able to gradually increase his activity level." The record from the December 3, 2003 visit reflects that Claimant was not working at that time and "ha[d] persistent multiple subjective complaints of pain." Dr. Petkovich would not authorize any refills for pain medication beyond the one authorized at that visit, and he released Claimant from his care.

The deposition of Dr. Thomas Musich, a primary care physician, was offered by Claimant and received into evidence. Dr. Musich testified that he evaluated Claimant in April 2002 and May 2004, each time reviewing Claimant's medical records. Dr. Musich's letters documenting each evaluation were received as exhibits to the deposition. Dr. Musich's May 2004 letter stated that Claimant "suffered acute traumatic injury on or about February 22, 3003, during the course and scope of his employment by [Employer]." Dr. Musich opined

that the work trauma of February 2003 is causally related to this patient's persistent complaints referable to his neck and low back, which in my medical [sic] have resulted in a permanent partial disability of 15% of the person as a whole referable to the cervical spine, accompanied with an additional partial disability of 30% of the man as a whole referable to his lumbosacral spine over and above pre-existing disability this gentleman suffered before February 2003. It is also my medical opinion that the combination of the above noted disabilities is significantly greater than their simple sum and will continue to produce a chronic hindrance in his routine activities of daily living.

After noting the 2002 evaluation, Dr. Musich's 2004 letter also stated that the combination of "past and present disabilities is significantly greater than their simple sum" and would also hinder daily activities. Dr. Musich also recommended that Claimant be evaluated by a vocational specialist in regard to his ability to be hired and work. He further stated that "[i]f nothing would be available" for Claimant vocationally, then "it would be [Dr. Musich]'s medical opinion that [Claimant] is totally and permanently disabled."

A vocational rehabilitation consultant, Gary Weimholt, testified by deposition that he evaluated Claimant and prepared a report in March 2005. In preparing the report, he considered medical records, Claimant's self-reported information, and vocational tests completed by Claimant.

Based on the medical records, Mr. Weimholt concluded that Claimant's work restriction level was "something less than the full range of light work and also affecting even work at a sedentary level." Mr. Weimholt assessed Claimant's intellectual functioning as well as his "bilateral arm hand coordination and fine finger dexterity."

Mr. Weimholt's report, received as an exhibit to his deposition, indicated that Claimant's spelling and arithmetic abilities suggested "serious limitations when considering less physical jobs at a Sedentary and Light physical demand level." The report also reflected a "lack of transferable job skills" by Claimant, an expectation that Claimant would be unable to perform even "food service work[,]" and he concluded that "an employer, in the normal course of business[,]" would not hire Claimant. Mr. Weimholt opined that Claimant was totally disabled based upon a combination of "work related injuries from 1999 and 2003 *along with other medical problems* [.]" (Emphasis added.) His written evaluation noted that Claimant "has also been determined to be totally disabled by the Social Security Administration." Mr. Weimholt agreed that Claimant had "no clear cognitive reason" barring him from retraining as to some vocational skills.

After hearing Claimant's testimony and receiving other evidence, the Division determined that "[b]ased on the medical records, it is clear that [Claimant] continued to work after the February 22, 2003 injury and was reinjured twice. Furthermore, the May 14, 2003 injury and the June 10, 2003 injury could have potentially had an effect on the employee's ability to work." The Division determined that although Dr. Musich and Mr. Weimholt each evaluated Claimant after his subsequent injuries had occurred, neither witness had addressed the effect those injuries had on Claimant's condition. As a result, the Division found their opinions "not credible."

Focusing on the February 2003 injury, the Division found that Claimant "did not prove that an employer would not have hired the employee based on his physical condition" or "that he could not compete in the open labor market." The Division also determined that Claimant was "not permanently and totally disabled from the February 22, 2003 injury or a combination of the February 22, 2003 injury and his pre-existing injuries." The Division found that Claimant suffered a disability of 20% to the body as a whole based upon his February 22, 2003 injury. The Division found that Claimant's other preexisting disabilities resulting from diabetes, wrist injury, and the April 2002 injury to his lower back did not meet the minimum levels required for Fund liability. The Division determined that the pre-existing injuries to each shoulder "combine[d] with the disability associated with his back such that the overall disability is greater than the parts and a load factor of 15% should be applied to account for the synergistic disability that exceeds the sum of the parts." As a result, the Division directed the Fund to pay Claimant $10,591.34 based upon rates for permanent partial disability and Claimant's average weekly wage.

The Commission agreed with the Division's "ultimate conclusions," and it additionally found "that the treatment records of Dr. Petkovich competently and substantially support[ed] the [Division's] findings." The Commission found that "Dr. Petkovich's records clearly show that [Claimant] had pain complaints following both of the subsequent injuries [occurring after May 5, 2003] and that [Claimant] did not stop going to work for [E]mployer until after both of those injuries had occurred." The Commission further reasoned that "[b]y not accounting for, or even addressing,

[Claimant's] subsequent injuries, Dr. Musich and Mr. Weimholt's opinions do not accurately assess [Claimant's] permanent partial disability attributable to the primary [February 22, 2003] injury." The Commission contrasted this with Dr. Petkovich's records documenting that Claimant "was released to return to his 'regular job as tolerated' a mere 10 weeks after the primary injury." The Commission noted that "[w]hether [Claimant] was competent to compete in the open labor market after his two subsequent injuries in May and June 2003 has no bearing on our determination in this case. Our determination is based on [Claimant's] condition at the time the primary injury occurred." The Commission affirmed the Division's award based on an "enhanced permanent partial disability[.]" This appeal timely followed.

## Analysis

### Point I—The Commission did not substitute its opinion for an uncontradicted medical opinion

█ Claimant's first point contends the Commission erred in finding that he had not met his burden of proof when "[the Commission] substituted its opinions as to the medical causation of [Claimant]'s disability for the opinions of uncontradicted medical experts." Claimant argues that "[w]hile the Commission skillfully attempts to patch together evidence to prop up its adopted opinion, it simply continues to substitute its own judgment as to the cause of [Claimant's] disability for that of the medical experts in this case, something it cannot do." Claimant posits that because Dr. Musich had information about the subsequent injuries in the records, he could have dealt with them "had he thought they were noteworthy[,]" and the parties must have viewed the matter as insignificant as no one questioned Dr. Musich about it during his deposition. Claim-

ant then reasons that Dr. Musich's findings "all relate to the injuries of February 22, 2003, rather than to any subsequent injury." Claimant also asserts that the Fund could have clarified the issue of subsequent injuries with Mr. Weimholt, but it chose not to do so. Claimant adds that he could not recall the subsequent injuries at the hearing before the Division because they "were so trivial" and he asserts that he was credible on this issue.

█ Although Claimant argues the Commission should have inferred that Dr. Musich and Mr. Weimholt considered insignificant the effect of Claimant's subsequent injuries in determining the effect of his February 2003 injury, the Commission was free to reject such an inference given the vacuum left by Dr. Musich and Mr. Weimholt on this issue. *See Cook,* 323 S.W.3d at 110; *Duever,* 371 S.W.3d at 866. It does not help Claimant that counsel for the Fund chose not to cross-examine Dr. Musich and/or Mr. Weimholt regarding the impact of the subsequent injuries; it is Claimant's "burden to establish permanent total disability by introducing evidence to prove [his] claim." *Carkeek v. Treasurer of the State of Missouri–Custodian of the Second Injury Fund,* 352 S.W.3d 604, 608 (Mo.App. W.D.2011). The Fund "has no obligation to present conflicting or contrary evidence on the claim for permanent total disability benefits." *Michael v. Treasurer, State of Missouri, as Custodian of the Second Injury Fund,* 334 S.W.3d 654, 662 (Mo.App. S.D.2011). Rather, a claimant "must prove the nature and extent of any disability by a reasonable degree of certainty." *Elrod v. Treasurer of Missouri as Custodian of the Second Injury Fund,* 138 S.W.3d 714, 717 (Mo. banc 2004).

Nor did the Commission reject uncontradicted medical evidence in favor of the Division's conclusion. Rather, the Com-

354

mission favored medical evidence in the form of Dr. Petkovich's reports as submitted by Claimant at the hearing. Claimant also testified that he had incurred work injuries subsequent to the injury he claims as his compensable injury. Dr. Petkovich's records further document that: Claimant returned to work after the February 2003 injury before he was subsequently injured in May 2003 and June 2003; the February 2003 injury caused a permanent partial disability; Claimant was again released to light duty even after his subsequent injuries; and Dr. Petkovich opined in his records that Claimant's activity level after December 2003 should increase.

While Dr. Petkovich did not provide an opinion as to the synergistic effect of the February 2003 injury in combination with Claimant's preexisting disabilities, and although the Commission agreed with the Division that Dr. Musich was not credible on the issue of the degree of disability caused by Claimant's February 2003 injury, it could rely on Dr. Musich's testimony regarding any synergistic effect of the injuries as it was free to determine what parts of Dr. Musich's testimony to accept or reject. *Pace*, 367 S.W.3d at 150. Point one is denied.

*Point II—Finding that Claimant was not permanently and totally disabled by the last injury and prior disabilities is not against the overwhelming weight of the evidence*

█ Claimant's second point contends "[t]he overwhelming weight of the evidence establishes that [he] is permanently and totally disabled as a result of" disabilities from preexisting shoulders and wrist injuries combined with "the February 22, 2003, injuries to his low back and neck."

█ "[I]n order for the claimant to be entitled to recover permanent total disabil-ity benefits from the [Fund], he must prove that the last injury, combined with his pre-existing permanent partial disabilities, result in permanent total disability." *Dunn v. Treasurer of Missouri as Custodian of the Second Injury Fund*, 272 S.W.3d 267, 272 (Mo.App. E.D.2008). The "last injury" is the compensable injury. *See id.* In this case, Claimant's "Claim for Compensation" refers to the February 2003 injury.

"[T]otal disability" is statutorily defined as the inability to return to any employment and not merely the inability to return to the employment in which the employee was engaged at the time of the accident. [Section] 287.020.7. The test for permanent total disability is whether, given the employee's situation and condition, he or she is qualified to compete in the open job market.

*Houston v. Roadway Express, Inc.*, 133 S.W.3d 173, 178 (Mo.App. S.D.2004).

Claimant argues that his own testimony about his pain and physical limitations, Dr. Musich's opinions, and Mr. Weimholt's opinions as to Claimant's employability together answered "[t]he pivotal question" of whether he would be hired by "any employer in the usual course of business ... reasonably expecting" Claimant to do the job he was hired to do. He claims that he "*now*" has "significant functional limitations" that "coupled with his age, education and work history simply keep him from being competent to compete in the open labor market[.]" (Emphasis added.) Assuming, *arguendo*, that Claimant is now permanently and totally disabled, the question before the Commission was whether he was in that condition immediately after his February 2003 injury.

In considering the weight of any particular evidence related to that question, we are assessing its "probative value; its ef-

fect in inducing belief." *Brooks v. General Motors Assembly Div.*, 527 S.W.2d 50, 53 (Mo.App.St.L.D.1975). Claimant's subsequent return to work in May 2003 is particularly significant because "[the Fund] is not responsible for progression of preexisting conditions or new conditions that develop after and unrelated to the work injury." *Lammert v. Vess Beverages, Inc.*, 968 S.W.2d 720, 725 (Mo.App. E.D.1998) (*overruled on other grounds by Hampton*, 121 S.W.3d at 223).

Considering the whole record, it was not against the overwhelming weight of the evidence for the Commission to find, based upon Claimant's return to work after his February 2003 injury (before he sustained two additional injuries between May 9, 2003 and June 10, 2003), that Claimant was not permanently and totally disabled by the combination of his pre-existing disabilities and the February 2003 injury. *See Rector v. Gary's Heating & Cooling*, 293 S.W.3d 143, 149 (Mo.App. S.D.2009) (substantial and competent evidence supported factual determination that employee who returned to work after 2004 injury was only permanently partially disabled and then became permanently and totally disabled after a 2005 injury).

As earlier noted, the Commission was not obligated to infer that Dr. Musich and Mr. Weimholt *meant* to opine that the February 2003 injury alone was sufficient to induce permanent total disability in Claimant when combined with his prior disabilities. And we cannot say that such an inference would have carried overwhelming weight when measured against the medical evidence from Dr. Petkovich's records regarding Claimant's post-February 2003 return to work.

Point two is also denied, and the final award of the Commission, being supported by sufficient competent and substantial evidence, is affirmed.

JEFFREY W. BATES, J. and DANIEL E. SCOTT, P.J., concur.